Filed 4/30/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SCOTT D. FLINT,<br><br>        Defendant and Appellant. | A144631<br><br>(Mendocino County<br>Super. Ct. No. CR9613174) |

Scott D. Flint was committed to the custody of the California Department of State Hospitals (DSH) for an indeterminate term, after a jury found he was a sexually violent predator (SVP) under the Sexually Violent Predators Act (Welf. & Inst. Code,[1] § 6600 et seq.) (SVPA or the Act). Flint appeals, contending: (1) he was deprived of his right to equal protection when he was compelled to testify in the People's case-in-chief, because a person found not guilty of crimes by reason of insanity (NGI) may not be compelled to testify at hearings to extend his or her commitment; (2) the trial court prejudicially erred by allowing the People's expert witness to testify about case-specific facts based on inadmissible hearsay prohibited by *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); and (3) the cumulative error violated his due process rights and deprived him of a fair trial, requiring reversal. Although we reject Flint's second and third arguments for reversal, we shall remand the matter to the trial court to afford the People the opportunity to justify the differential treatment of SVP's and NGI's as to whether they may be called as witnesses for the People in their respective commitment hearings.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

# I.  BACKGROUND

In 1992, Flint was sentenced to eight years in prison after pleading guilty to three counts of violating Penal Code section 288, subdivision (a), by committing lewd and lascivious acts on children under the age of 14 in 1987 and 1988.  Flint was paroled in 1996, but pleaded guilty in 1997 to another count of violating section 288, subdivision (a), by committing lewd and lascivious acts on a child under the age of 14.  He was sentenced to prison.[2]

Flint was scheduled to be released from custody in August 2011.  In July of that year, the Mendocino County District Attorney filed a petition to involuntarily commit him as an SVP.  A supporting declaration averred that DSH[3] had concluded Flint was an SVP based upon the evaluations of two mental health professionals who determined Flint had a diagnosed mental disorder that predisposed him to commit sexual acts creating a danger to the health and safety of others.  Before the trial on the petition, Flint moved in limine to prohibit the prosecution from calling him as a witness, arguing that it was an equal protection violation to compel an SVP to testify because the prosecution could not call as a witness an NGI or a juvenile in commitment extension hearings.  The trial court, relying on then current authority,[4] denied the motion.

A jury trial followed, and the People called Flint as a witness in their case in chief.  The People also called as witnesses three victims of Flint's past offenses and, as an expert witness, DSH psychologist and SVP evaluator, G. Preston Sims.  Flint in turn called as

---

[2] While in prison, Flint pled guilty to committing an unrelated offense and his sentence was extended.

[3] DSH previously was known as the State Department of Mental Health.  (*State Dept. of State Hospitals v. Superior Court* (*Novoa*) (2015) 61 Cal.4th 339, 345, fn. 4.)  To avoid confusion, we refer to the entity throughout as DSH.

[4] The trial court's ruling predated this division's decision in *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*), discussed below.

witnesses a behavior specialist at the state hospital where he was confined, two expert psychologists who had evaluated him, and a friend who had offered him a job and housing on his release. At the conclusion of the trial, the jury found Flint qualified as an SVP. On February 19, 2015, the court ordered Flint committed for an indefinite term to DSH for appropriate treatment and confinement in a state hospital. This timely appeal followed.

## II.     DISCUSSION

In his original opening appellate brief, Flint contends the trial court violated his equal protection rights by compelling him to testify as a witness in the People's case-in-chief during his commitment trial. After our Supreme Court issued its decision in *Sanchez*, *supra*, Flint requested and secured leave to file a supplemental opening brief asserting that reversal is required because the trial court allowed the People's expert, Sims, to provide testimony that included a large amount of case-specific hearsay. In his supplemental opening brief, Flint also included a cumulative error argument. The People subsequently filed a supplemental respondent's brief and Flint filed a supplemental reply. We address Flint's arguments in turn below.

A. Compelled Testimony

**1. The SVPA**

To frame Flint's equal protection argument, we provide a brief overview of the SVPA. The act "provides for indefinite involuntary civil commitment of certain offenders who are found to be SVP's following the completion of their prison terms. [Citation.]" (*People v. Field* (2016) 1 Cal.App.5th 174, 181 (*Field*).) " ' "Sexually violent predator" means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' [¶] To establish that a person is an SVP, the prosecution is required to prove the following: (1) the offender has been convicted of a qualifying sexually violent offense against at least two victims; (2) the offender has a diagnosed mental disorder;

3

(3) the disorder makes it likely the offender would engage in sexually violent conduct if released; and (4) this sexually violent conduct will be predatory in nature. [Citation.] The prosecutor must establish these elements beyond a reasonable doubt and the jury verdict must be unanimous. [Citation.]" (*Ibid.*)[5]

### 2. Analysis

Flint makes the following equal protection argument: SVP's are similarly situated to NGI's; because NGI's cannot be required to testify at their commitment extension hearings (*Hudec v. Superior Court* (2015) 60 Cal.4th 815, 826), it is a violation of equal protection to require a committee to testify at an SVP commitment hearing; and if Flint had not been compelled to testify, there is a reasonable probability he would have achieved a more favorable result. The People argue in response that SVP's and NGI's are not similarly situated under the equal protection clause for purposes of compelled testimony, that there is an adequate basis for treating SVP's and NGI's differently in this context in any event, and that any error was harmless.

We decided these issues in our prior opinion in *Curlee*, *supra*, 237 Cal.App.4th 709. Although the Attorney General now argues that decision was "incorrect and should not be followed," and Flint also takes minor issue with it, we decline both parties' invitations to revisit it.

a. <u>SVP's and NGI's Are Similarly Situated for Purposes of Compelled Testimony</u>

" 'The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, " '[t]he first prerequisite to a meritorious claim under the equal protection

---

[5] Although a proceeding under the SVPA is civil in nature, the common practice is to characterize the parties to the action as "the prosecution" and "defense." (*Field*, *supra*, 1 Cal.App.5th 174, 179, fn. 2.)

4

clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' " [Citation.] "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " [Citation.]' [Citation, italics omitted.]" (*People v. Valencia* (2017) 3 Cal.5th 347, 376.) The second step is determining whether there is a sufficient justification for the unequal treatment. The level of justification needed is based on the right implicated. When the disparity implicates a suspect class or a fundamental right, strict scrutiny applies. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836.) When no suspect class or fundamental right is involved, the challenger must demonstrate that the law is not rationally related to any legitimate government purpose. (*Ibid.*)[6]

"Under both the United States and California Constitutions, a person has the right to refuse to answer potentially incriminating questions put to him or her in any proceeding; in addition, the defendant in a criminal proceeding enjoys the right to refuse to testify at all." (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1446 (*Dunley*).) Commitment proceedings involving NGI's and SVP's are civil in nature. (*Ibid.*) In *Hudec v. Superior Court*, *supra*, 60 Cal.4th 815, however, our Supreme Court concluded that NGI's could not be compelled to testify at commitment extension hearings because Penal Code section 1026.5, subdivision (b)(7), affords them all " ' "the rights guaranteed under the federal and State Constitutions for criminal proceedings." ' " (*Id.* at p. 826, italics omitted.) In *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), our Supreme Court concluded that SVP's and NGI's are similarly situated when analyzing the term of

---

[6] Although not relevant here, a level of intermediate scrutiny also " 'has been applied to discriminatory classifications based on sex or illegitimacy. [Citations.]' [Citations.]" (*People v. Wilkinson*, *supra*, 33 Cal.4th at pp. 836-837.)

5

commitment and the burden of proof for release.  (*Id*. at pp. 1183–1184, 1196, 1202, 1207.)

In *Curlee*, *supra*, 237 Cal.App.4th 709, this division squarely addressed the issue that Flint raises here, namely, whether SVP's and NGI's are similarly situated when analyzing the permissibility of compelled testimony at the commitment hearing.  (*Id*. at pp. 716, 720.)  Relying on *McKee I* and its predecessor, *In re Moye* (1978) 22 Cal.3d 457, *Curlee* answered the question in the affirmative, based on the following reasoning:  "*The preconditions to commitment are similar*:  Both groups have committed a criminal act and have been found to suffer from a mental condition that might present a danger to others. [Citation.]  At the end of the SVP's prison term, and at the end of the term for which an NGI could have been imprisoned, each is committed to the state hospital for treatment if, at the end of that period, the district attorney proves in a jury trial beyond a reasonable doubt that the person presents a danger to others as a result of a mental disease, defect, or disorder.  [Citations.]  *The purpose of the commitment is the same*:  To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders.  [Citations.]"  (*Curlee*, at p. 720, italics added.) Our colleagues in several other Courts of Appeal—including Divisions One, Two, and Three of the Fourth Appellate District—have agreed with our reasoning and holding in *Curlee*.  (See *People v. Alsafar* (2017) 8 Cal.App.5th 880, 882–883, 886–887 [rejecting the Attorney General's argument that "the holding in *Curlee* 'was incorrect and should not be followed' "]; *Field*, *supra*, 1 Cal.App.5th at p. 194 [following *Curlee* on this issue]; *Dunley*, *supra*, 247 Cal.App.4th at p. 1443 [same]; *People v. Landau* (2016) 246 Cal.App.4th 850, 864 [same].)

The People argued in *Curlee* "that SVP's [were] not similarly situated to NGI's for purposes of whether they may be called as witnesses for the prosecution because an SVP is initially evaluated while in the custody of [CDCR] [citation], while the NGI has been committed to [DSH] for treatment since having been found insane at the time of the

6

offense [citation]." (*Curlee*, *supra*, 237 Cal.App.4th at p. 720.) As a result, the People contended, they had more information about NGI's and whether NGI's needed further treatment, obviating the need for NGI's to testify at trial. (*Ibid.*) Curlee disputed this assertion, pointing out that, after an SVP petition is filed, the person is evaluated by mental health professionals, there is a probable cause hearing, and the person may be committed to the state hospital for years pending trial, providing state hospital staff ample time to evaluate the person's treatment needs.[7] (*Ibid.*) Ultimately, this division agreed with Curlee that NGI's and SVP's were similarly situated. (*Id.* at p. 721.) Observing that the record there did not permit a determination of whether the People were "likely to have more information on an NGI's mental state than on that of an SVP," *Curlee* concluded that, in any event, the argument addressed the second prong of the equal protection analysis—"whether the [People] [had] justified the disparate treatment of NGI's and SVP's"—and not the first "similarly situated" prong. (*Ibid.*)

Focusing on the court's preliminary observation about the state of the record in that case, the People here claim *Curlee* was incorrectly decided and should not be followed, and then attempt the same "similarly situated" argument that *Curlee* rejected. *Curlee* was incorrectly decided, the People contend, because "the issue is legal not factual." This court need not consider, as a factual matter, the relative amounts of information available under the two statutory schemes, the People argue; regardless, NGI's and SVP's cannot be considered similarly situated because there are "schematic differences" between the groups. In particular, one group (NGI's) is "committed for treatment in the state hospital," the People point out, while the other (those alleged to be SVP's) have "been sentenced to serve a term in prison." This necessarily "means the amount of treatment

---

[7] Here, for example, after the commitment petition was filed and a probable cause hearing held, the trial court ordered Flint housed in a state hospital, where he remained for more than three years, until his trial commenced.

7

data and the [People's] access to the data" also will differ, and that difference provides "the explanation for the disparity" in treatment. It is "a *legislative fact . . . .* regardless of any judicial facts."

The People's terminology here is perplexing,[8] and their reasoning is circular. We are unpersuaded that *Curlee* erred in concluding that NGI's and SVP's are similarly situated for purposes of determining whether they may be compelled to testify at their commitment hearings. (*Curlee*, *supra*, 237 Cal.App.4th at p. 721.)

### b. Strict Scrutiny Applies

The People contend that any disparate treatment here need only be justified under the rational basis test. In *McKee I*, *supra*, our Supreme Court applied strict scrutiny to review differences in definitional standards and burdens of proof among civil commitment schemes. However, the People point out the court specifically rejected the notion that its decision extended the strict scrutiny standard to " 'every detail of every civil commitment program.' " (*McKee I*, *supra*, 47 Cal.4th at p. 1210, fn. 13.) That exacting standard is not properly applied in evaluating the justification for extending a testimonial privilege to NGI's but not SVP's, the People submit, because the right not to be called as a witness for the prosecution touches on "a single aspect of the trial process." There is no constitutional right not to testify in this context, the People note; the right is only afforded to NGI's by statute.

---

[8] The People's contention that the distinction between NGI's and SVP's involves an issue of "legislative fact" not susceptible to proof at an evidentiary hearing is not persuasive. "Legislative facts" typically refer to "the legislative findings with regard to the need for, or probable effect of," a challenged statutory provision. (See, e.g., *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 348–349 & fn. 25 (plur. opn. of George, C.J.).) Here, however, the Legislature made no findings as to why it conferred a statutory right against self-incrimination on NGI's but failed to extend such a right to SVP's. Even if it had, legislative findings could not by themselves justify differential treatment, since "evidence introduced at trial may call into question legislative fact finding." (*McKee I*, *supra*, 47 Cal.4th at p. 1207.)

8

The People raised the same arguments in *Field*, *supra*, 1 Cal.App.5th 174, which addressed this precise issue, and we quote *Field*'s reasoning on this point here as we find it to be persuasive: "The fact that the claimed right is found in a statute and not the California or United States Constitution does not mandate that we apply a rational basis review. [Citations.] And we are not persuaded by the People's claim that 'the right at issue here touches on only a *single* procedural aspect of the trial process.' (Italics in original.) To the contrary, the ability to call an SVP in the prosecution's case could be the most important evidence it places before the jury. As our Supreme Court observed, permitting the jury to observe the person sought to be committed and to hear him speak and respond provided 'the most reliable proof and probative indicator of the person's present mental condition.' [Citation.] Further, '[b]y calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case.' [Citation.] Considering the potential impact of an SVP testifying at his or her commitment hearing, it logically follows that an SVP's testimony could have a direct impact on the SVP's liberty interest, namely the prosecution could use the testimony to prove that he or she should remain committed. Against this backdrop, we determine that strict scrutiny is the proper test to apply to the People's justification of the disparate treatment. [Citation.]" (*Id*. at p. 196.) We agree. (See also, *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20 ["this court has traditionally subjected involuntary civil commitment statutes to the most rigorous form of constitutional review"]; *Dunley*, *supra*, 247 Cal.App.4th at pp. 1443, 1450, 1453 [NGI's, SVP's, and those involuntarily committed as a condition of parole under the Mentally Disordered Offenders Act are all similarly situated with respect to the testimonial privilege, and the strict scrutiny test applies in determining whether disparate treatment on this issue can be justified]; *People v. McKee* (2012) 207 Cal.App.4th 1325, 1335 (*McKee II*) [" 'Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment' "].)

9

c.  A Remand Is Appropriate

"Under the strict scrutiny test, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. [Citation.]  Here, the People have offered no justification under the strict scrutiny test to justify the disparate treatment. Thus, following [citation], '[w]e emphasize that, like our high court in [*McKee I*, *supra*], we do not conclude the People cannot meet their burden to show the testimony of an NGI is less necessary than that of an SVP.  We merely conclude that they have not yet done so. In our view, the proper remedy is to remand the matter to the trial court to conduct an evidentiary hearing to allow the People to make an appropriate showing.' " (*Field*, *supra*, 1 Cal.App.5th at p. 197; see *McKee I*, *supra*, 47 Cal.4th at pp. 1207–1209; *Curlee*, *supra*, 237 Cal.App.4th at p. 722.)[9]

d.  Any Error In Compelling Flint To Testify Was Prejudicial

The People contend that, even if Flint had a right not to testify, we should affirm because there is no reasonable probability Flint would have achieved a more favorable outcome had he not testified in the People's case-in-chief and denial of the right, therefore, was harmless.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  We disagree.  We conclude, as this division previously did in *Curlee*, that " '[b]y calling [Flint] in its case-in-chief, the state [was] essentially saying that his . . . testimony [was] necessary for the state to prove its case.  We have no doubt that a committee so compelled

---

[9] Flint asserted in his opening brief that no remand is necessary because the equal protection issue was litigated and resolved against the People in the trial court.  However, because neither the parties nor the trial court had the benefit of our decision in *Curlee*, the People did not present evidence to justify the disparate treatment of SVP's and NGI's, and the trial court did not hold an evidentiary hearing to address that issue.  Under those circumstances, as Flint ultimately acknowledged in his reply brief, remand is appropriate.

to testify is prejudiced under these circumstances. . . .' [Citation.]" (*Curlee*, *supra*, 237 Cal.App.4th at p. 722; accord, *People v. Landau*, *supra*, 246 Cal.App.4th at p. 865.)

The People maintain that *Curlee*'s harmless error analysis was faulty because, taken to its logical conclusion, it would require reversal any time a trial court erroneously admits testimony by a prosecution witness. *Curlee* did not create such a rule, however; nor do we. As support for its conclusion that any error necessarily was prejudicial, *Curlee* focused on the identity of the person whose testimony was compelled. Quoting our Supreme Court in *Cramer v. Tyars* (1979) 23 Cal.3d 131, 139, *Curlee* reasoned " 'that permitting the jury to observe the person sought to be committed and to hear him speak and respond provided "the most reliable proof and probative indicator of the person's present mental condition." [Citation.]' [Citation.]" (*Curlee*, *supra*, 237 Cal.App.4th at p. 722.) We concur.

The People also fault *Curlee* contending that it effectively established a rule of per se reversal where a prisoner is compelled to testify in this context, and that the error of doing so is demonstrated here because Flint's testimony at best was cumulative of other evidence. Again, we must disagree. As noted previously, to commit Flint as an SVP, the jury unanimously had to conclude, beyond a reasonable doubt, among other things, that Flint (1) had a diagnosed mental disorder, (2) making it likely that, if released, he would engage in sexually violent conduct (3) that was predatory. (*Field*, *supra*, 1 Cal.App.5th at p. 182.) " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) " 'Predatory' means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

11

Without deciding the standard governing reversal if an alleged SVP is improperly compelled to testify in a commitment proceeding,[10] we agree with Flint that his testimony here included responses that were prejudicial. As the People themselves acknowledge, in his testimony, Flint "admitted the details of his criminal history and his past problems controlling his attraction to young girls." He admitted, for example, that: he rubbed his penis against one 10-year old victim's vagina and performed oral sex on her on multiple occasions; he molested the same victim most of the time when he was alone with her; he knew when he molested another victim that he would go back to prison if he did so, and he did it anyway; he downplayed the severity of his conduct when interviewed by the police; he omitted details of his abuse when questioned by a DSH psychologist prior to his trial; and he declined to enroll in the formal sex offender treatment program at the state hospital. The People specifically cited Flint's testimony in their closing argument, contending the jury could not trust him when he said he no longer had such urges because he had "proven to be a liar," and had downplayed his misconduct previously. If it was error to compel Flint's testimony, therefore, the error was prejudicial.

B. *Sanchez*

Flint contends the order committing him to DSH also should be reversed because the evidence against him "consisted almost entirely of [an expert witness's] case-specific hearsay," which did not otherwise fit a qualifying hearsay exception, and admission of the evidence deprived him of a fair trial resulting in a miscarriage of justice. (Cal. Const., art. VI, § 13.)[11] Although Flint's attorney did not object to the hearsay, Flint contends the

---

[10] Both parties assume that the *Watson* standard would apply.

[11] This argument raises a purely evidentiary issue since, as Flint acknowledges, the Sixth Amendment right to confront witnesses does not apply in civil proceedings under the SVPA. (*People v. Otto* (2001) 26 Cal.4th 200, 214.) While Flint asserts that the admission of hearsay evidence also violated his due process rights, he does not support that contention by any independent authority or analysis. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [each point must appear under a separate subheading and must be

omission should be excused because any objection would have been futile. Alternatively, Flint contends, his attorney's failure to object to the hearsay constituted ineffective assistance of counsel. The People disagree. They contend: Flint forfeited this argument by failing to object; most of the facts conveyed through the expert's challenged testimony were proven by independent evidence; and any error was harmless in light of the overwhelming evidence supporting the expert's testimony.

### 1. Flint Did Not Forfeit His Hearsay Objections

Flint's trial under the SVPA occurred a year before our Supreme Court issued *Sanchez, supra*, 63 Cal.4th 665, "which significantly changed the rules governing testimony by expert witnesses about the hearsay upon which they relied in forming their opinions. Under the law prevailing at the time of [Flint's] hearing, an expert was permitted to testify relatively freely about the content of hearsay evidence relating to the circumstances of the case at hand, if the evidence constituted a basis for his or her opinion. [Citation.]" (*People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 506, fn. omitted (*Jeffrey G.*).) The theory was that the expert's testimony was not admitted for the truth, in such circumstances, but, rather as evidence of the basis for the opinion. (*Sanchez*, *supra*, at p. 679.) Under this paradigm, a court allowed such testimony, depending on the nature and amount of the out-of-court statements involved, if it concluded a jury could properly follow a limiting instruction, which directed them to consider the expert's testimony only as the basis for his or her opinion, and not for the truth. (*Ibid.*)

In *Sanchez*, however, the court concluded "this paradigm [was] no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its

---

supported by argument and citation of authority]; *Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 600 [a contention not presented under separate heading, with supporting factual analysis, is forfeited].)

truth by the jury." (*Sanchez*, *supra*, 63 Cal.4th at p. 679.) "Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion," the court continued, "hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id*. at p. 684.)

At Flint's commitment trial, the People's expert, Sims, gave testimony that included details and circumstances of Flint's offenses, and facts about Flint's subsequent treatment history, which Sims derived from his review of Flint's legal and medical records, his interviews with Flint, and his conversations with staff of the state hospital where Flint was committed before the trial. We conclude Flint did not forfeit his legal claim regarding the admissibility of this testimony by failing to object at the hearing. On this point, we find persuasive the reasoning of Division One of this court, in *Jeffrey G.*, *supra*, which we quote here at some length: "There is no dispute that *Sanchez* materially changed the law governing expert testimony in effect at the time of the [commitment trial]. The *Sanchez* court expressly disapproved six prior Supreme Court decisions, noting, in particular, 'We also disapprove *People v. Gardeley* [(1996)] 14 Cal.4th 605, to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules' (*Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13.)" (*Jeffrey G.*, 13 Cal.App.5th at p. 507 & fn. 4.)

" ' "[R]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence." ' [Citation.] In addition, parties are generally not

14

required to anticipate rulings that significantly change the prevailing law.  Our Supreme Court has consistently entertained claims premised on *Crawford v. Washington* [(2004)] 541 U.S. 36, despite a defendant's failure to object on that ground, if the hearing occurred prior to *Crawford*'s issuance.  As the court explained . . . [citation], '[b]ecause *Crawford* "was a dramatic departure from prior confrontation clause case law," a defendant's failure to raise a *Crawford* claim in a pre-*Crawford* trial "is excusable because defense counsel could not reasonably have been expected to anticipate this change in the law." ' [Citations.]  While *Sanchez* might not have been as dramatic a departure from prior law as *Crawford*, it certainly worked a significant change."  (*Jeffrey G.*, *supra*, 13 Cal.App.5th at pp. 507–508; see also *People v. Kitchens* (1956) 46 Cal.2d 260, 263 ["A contrary holding would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal"].)[12]

In arguing for forfeiture, as in *Jeffrey G.*, the People contend that much of Sims's hearsay testimony was based on documentary evidence that otherwise would have been admissible under statutory hearsay exceptions.  To the extent the People are suggesting Flint's argument here is foreclosed because he did not provide them an opportunity to cure the problem by objecting before the trial court, we conclude, as the court did in *Jeffrey G.*, that they "fail[] to overcome the futility concern present here.  Even if defense counsel had interposed appropriate hearsay objections, the objections would undoubtedly have been resisted by the prosecution and overruled by the court, which would have left [Sims's]

_____

[12] Although in *People v. Perez* (Apr. 12, 2018, E060438) __ Cal.App.5th __, <http://www.courts.ca.gov/opinions/documents/E060438A.PDF>, the Fourth District held that the appellant did forfeit an objection to an expert's case-specific hearsay testimony by failing to raise it in anticipation of *Sanchez* (*id.* at pp. 3, 59–60), we find the reasoning in *Jeffrey G.* to be more persuasive.  (See also, *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1283 [any objection to an expert's case-specific hearsay testimony before *Sanchez* would have been futile].)

15

testimony unchanged and lacking the foundation required by *Sanchez*. Only if the trial court had refused to follow applicable precedent would the prosecution have been forced to lay a *Sanchez*-appropriate foundation." (*Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 508.)

The People also contend that trial counsel could have anticipated "that *Sanchez* would one day issue and change the law," if he paid more attention to our Supreme Court's docket and recent developments in the case law governing experts. (*Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 508.) Again, we echo our colleagues in Division One and "decline to require such prescience." (*Ibid.*)[13]

### 2. Analysis

In his opening brief, Flint presents a list of 13 instances in which, he asserts, Sims's testimony included case-specific hearsay statements prohibited under *Sanchez*. The People counter that most of that testimony was not prohibited under *Sanchez* because Sims was merely discussing case-specific facts the People independently proved through the trial testimony of other witnesses—i.e., through testimony from the victims, Flint himself, and Flint's witness, psychologist Brian Abbott—and that the remaining portions of Sims's challenged testimony either were covered by a hearsay exception or were not hearsay. In his reply brief, Flint asserts that, although an expert might properly refer to the testimony of other witnesses confirming certain case-specific facts, *Sanchez* does not allow an expert to freely repeat such facts. Additionally, while acknowledging that Sims could testify about any out of court statements Flint made to him, under the hearsay exception for party admissions (Evid. Code, § 1220), Flint contends the People could not rely on his own trial testimony as providing independent evidentiary support for Sims's hearsay statements, because his testimony was improperly compelled. Flint also disputes

---

[13] Because we conclude Flint did not forfeit the *Sanchez* issue, we need not address his claim of ineffective assistance of counsel resulting from the failure to object on hearsay grounds.

16

the People's argument that one of the listed instances of challenged testimony did not qualify as hearsay.

      a. <u>Whether *Sanchez* Permits An Expert To Relate "Independently Proven" Case-Specific Hearsay</u>

We begin with Flint's argument that Sims's case-specific hearsay statements were inadmissible under *Sanchez* even though other admissible evidence—i.e., other witness testimony—independently confirmed those case-specific facts. Flint submits that *Sanchez* includes "some ambiguity" on this point. For example, as he acknowledges, the Supreme Court there remarked, "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, *unless they are independently proven by competent evidence* or are covered by a hearsay exception." (*Sanchez*, *supra*, 63 Cal.4th at p. 686, initial italics in original, subsequent italics added.) This suggests an expert *might* relate case-specific factual assertions contained in out of court statements if the assertions are "independently proven by competent evidence." (*Ibid*.) Flint points out, however, that the court then summarized its ruling as follows: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Ibid*.) As an express articulation of a rule, Flint contends, the latter statement must be given priority. But Flint contends that the two statements do not actually contradict each other. Rather, read together, they signify that, an expert may "acknowledge" admissible evidence proving facts that were the subject of case-specific hearsay, but may not repeat those facts unless they are supplied to the expert in the form of a hypothetical question.

At least one recently-decided case, citing our decision in *People v. Stamps* (2016) 3 Cal.App.5th 988 (*Stamps*), appears to support Flint's interpretation. (See *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 413 ["testimony about case-specific facts of which [the expert] does *not* have personal knowledge is inadmissible, even if specific facts are independently proven by other evidence"]; *Stamps*, *supra*, 3 Cal.App.5th at p. 996 ["If

17

it is a case-specific fact and the witness has no personal knowledge of it, if no hearsay exception applies, and if the expert treats the fact as true, the expert simply may not testify about it"].) Several published decisions can be read to suggest a contrary interpretation. (See, e.g., *Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 506 [*Sanchez* bars experts from testifying about case-specific hearsay evidence "unless there is direct evidence of the matter discussed or the hearsay evidence has been admitted under an appropriate exception"]; *People v. Roa* (2017) 11 Cal.App.5th 428, 450 ["The limitation on expert testimony imposed by the Supreme Court in *Sanchez* applies to case-specific facts that are not independently proven or covered by a hearsay exception"]; *People v. Burroughs* (2016) 6 Cal.App.5th 378, 407 ["Under *Sanchez*, admission of expert testimony about case-specific facts was error—unless the documentary evidence the experts relied upon was independently admissible"].) In *Jeffrey G.*, for example, the court observed that, "although the prosecution experts' testimony was based on hearsay, there was evidence in the record [i.e., the testimony of the defendant and a psychologist who examined him] to support much of this otherwise improper testimony under *Sanchez*." (*Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 506.)[14] "If prior unobjected testimony supported the prosecution experts' case-specific testimony," the court concluded, "the testimony was not objectionable under *Sanchez*." (*Id.* at p. 510.) As we discuss below, the same is true here: much of the expert testimony to which Flint objects was based on victim testimony, party admissions, and other admissible evidence.

The People do not deny that, in all but one of the 13 instances Flint lists, their expert, Sims, recounted case-specific hearsay, treating the asserted facts as true, without having any personal knowledge of those facts. Although the People submit that Sims merely "discussed the facts already testified to by the three victims and [Flint]," Sims was

_____

[14] There is no suggestion that the defendant's testimony there was compelled. (*Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 504.)

18

not responding to hypothetically worded questions or directly discussing witness testimony.  Rather, he recounted as true case-specific out-of-court statements that he read in various reports.  Flint argues this was error because, even if such evidence was independently proven through another witness, it was not presented to the expert in the form of a hypothetical question, as *Sanchez* contemplates.  We think that, in these circumstances, cases such as *Vega-Robles* and *Jeffrey G.* are only superficially in tension with one another.  The correct analysis, in our view, boils down to harmless error.  It seems to us that even if the admission of expert testimony reciting as true case-specific hearsay that was independently proven through other witnesses technically constituted error, at most such error would be harmless on this record.  (See *People v. Vega-Robles*, *supra*, 9 Cal.App.5th at p. 414 [admission of expert testimony based on inadmissible hearsay was harmless error, given the "plethora of admissible evidence" on defendant's gang affiliation and leadership status].)  Accordingly, as in *Jeffrey G.*, the issues presented here turn on "(1) the exact nature of the case-specific evidence to which the prosecution expert[] testified *without* evidentiary support and (2) whether this testimony was prejudicial to defendant."  (*Jeffrey G.*, *supra*, 13 Cal.App.5th at pp. 506–507.)  It is to those issues that we now turn.

> b.  The Expert Recited Certain Case-Specific Hearsay As A Basis For His Opinions

Certain of Sims's testimony based on alleged case-specific hearsay did not recite hearsay at all, but instead statements that were properly admitted under a hearsay exception or that did not constitute hearsay at all.

*First*, the People point out that, in his challenged testimony, Sims relied on statements Flint made to Sims during their evaluation interviews, and the People contend this testimony was admissible under the hearsay exception for party admissions.  (Evid. Code, § 1220.)  The People submit the exception applied to 2 of the 13 instances that Flint includes in his list of Sims's case-specific hearsay testimony.  In one of those instances,

19

after recounting facts he gleaned from a police report about how Flint abused one of his four young victims, Sims testified that Flint gave him the same account in one of their interviews. In the other instance, Sims testified that he diagnosed Flint as having an amphetamine use disorder by reviewing reports and "discussing the specific symptoms of [that] disorder . . . ." Although Sims did not specify the person with whom he discussed those symptoms, he confirmed he based the diagnosis in large part on Flint's self-reporting, suggesting the discussion was with Flint. The conclusion is further supported by the fact that before and after this testimony, Sims was recounting information Flint provided in their interviews. Flint does not specifically deny that he self-reported his amphetamine use to Sims, or that Sims's testimony in the two instances was covered by the hearsay exception for party admissions to the extent it described statements Flint made in their interviews. Rather, he expressly concedes that statements he made to Sims were not inadmissible. We conclude that the exception did apply and that Sims's testimony in those two instances was admissible to the same extent. Sims's succinct accounts of (identical) information that he read in police or medical reports on those points constituted case-specific hearsay.

*Second*, the People also contend that one of the instances of Sims's challenged testimony was not hearsay. In that instance, Sims testified generally that he spoke to three doctors and a behavioral specialist at the state hospital where Flint was held before trial. The district attorney then asked whether those individuals "at any point . . . indicate[d] . . . that [Flint] had been working in depth on his previous offenses." Sims responded, "None of them stated [Flint] was working in depth" on his previous offenses. The People contend the response did not qualify as hearsay because Sims merely testified about the absence of any such statements. Flint objects that the exchange *implied* the state hospital personnel effectively conveyed an opinion that Flint was not working in depth on his issues. The testimony, he contends, therefore effectively permitted inadmissible hearsay

20

to be presented "through the back door." Flint cites no authority to support his argument and we are not persuaded.

As our Supreme Court observed in *People v. Zamudio* (2008) 43 Cal.4th 327 (*Zamudio*), " ' "[h]earsay evidence" is evidence *of a statement that was made* other than by a witness while testifying at the hearing and that is offered to prove the truth of *the matter stated.*' (Evid. Code, § 1200, subd. (a), italics added.)" (*Id*. at p. 350.) Flint is arguing that the failure of the hospital personnel to offer a specific comment about the level of effort he was expending on his previous offenses constituted a statement under the hearsay rule. (*Ibid*.) But, as the court recognized in *Zamudio*, " 'nonverbal conduct'— such as a person's silence—constitutes a 'statement' under the hearsay rule only if it was 'intended by [the person] as a substitute for oral or written verbal expression.' ([Evid. Code], § 225.)" (*Ibid*.) In the cited instance, however, Sims did not testify about any specific interaction with hospital personnel or describe any nonverbal conduct, such as silence, that might have been a substitute for verbal expression. (Cf. *People v. Jurado* (2006) 38 Cal.4th 72, 129 ["For purposes of the hearsay rule, conduct is assertive if the actor at the time intended the conduct to convey a particular meaning to another person"].) It might be a different matter, for example, had Sims testified that he specifically asked hospital personnel for their opinion about the level of effort Flint was expending in his treatment, and they responded with silence and assertive conduct. But here Sims was not asked about any specific conversation and he did not describe any specific verbal or nonverbal assertion constituting an out of court statement. The cited testimony was not hearsay.

Having concluded that Sims's challenged testimony in two instances relied in part on information Flint provided him, which was covered by a hearsay exception for party admissions, and in a third instance did not qualify as hearsay, we are left with 10 instances in which Sims's testimony included some case-specific facts that he gleaned from out-of-court statements contained in legal and medical reports, and that no hearsay exception

21

applied, arguably making that testimony inadmissible. In those instances, and in the two instances previously mentioned when he drew *in part* on case-specific hearsay statements, Sims primarily described the facts and surrounding circumstances of Flint's prior offenses. Additionally, he: repeated one fact contained in the report prepared by Flint's witness, psychologist Abbott; recounted that Flint attempted to enter the sex offender treatment core group at the state hospital, but then withdrew from it; and asserted that Flint corresponded with one victim's mother while he was in prison following his conviction for abuse of other victims. The admission of such expert testimony arguably was error. As we discuss in the next section, however, we conclude that any such error was harmless.

c. <u>Any Error Was Harmless</u>

The People contend that any error in admitting Sims's testimony was harmless under the standard set forth in *Watson*, *supra*, 46 Cal.2d at p. 836. Flint disputes the applicability of the *Watson* standard, contending that it would apply if the error concerned "just a single piece of evidence or a few pieces of evidence," but asserting that Sims's case-specific hearsay was pervasive and prejudicial, requiring automatic reversal under *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*). The testimony infected his entire trial, Flint asserts, resulting in a miscarriage of justice, even if the remaining evidence sufficed to prove he was an SVP. Alternatively, Flint contends reversal is required under the *Watson* standard, because this was a close case, and the People would have made a weaker showing had they been forced to rely on hypothetical questions in examining Sims. We do not agree with either contention.

As an initial matter, we are not persuaded that *Blackburn* requires automatic reversal here without inquiry into the strength of the evidence. (See *Blackburn*, *supra*, 61 Cal.4th at pp. 1132–1133.) In *Blackburn*, our Supreme Court observed that "most errors can be harmless." (*Id*. at p. 1133.) Only errors that "operate to deny a defendant an ' "orderly legal procedure" ' [citations]" (*ibid*.), i.e., those " ' "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself" '

22

[citation]" (*id*. at p. 1136), can entail a miscarriage of justice under article VI, section 13 of the state Constitution, requiring automatic reversal.  (*Id*. at pp. 1133–1136.)  "Such errors are ' "analogous to" ' those identified in the United States Supreme Court's decision in *Arizona v. Fulminante* (1991) 499 U.S. 279, 290 [citation], including depriving a defendant of counsel, using defendant's coerced confession in a criminal trial, or trying a defendant before a biased judge [citation]."  (*People v. Shiga* (2016) 6 Cal.App.5th 22, 45–46.)

In *Blackburn*, the error was a failure to obtain a valid jury waiver from a mentally disordered offender before a trial to extend his involuntary civil commitment.  (*Blackburn*, *supra*, 61 Cal.4th at pp. 1116–1117, 1132–1133.)  In concluding automatic reversal was required, the court quoted its reasoning in *People v. Lightsey* (2012) 54 Cal.4th 668, where it held that "failure to appoint counsel to represent a defendant during a mental competency proceeding, in violation of [Penal Code] section 1368, was automatically reversible because it was ' "analogous to" ' the ' "total deprivation of the right to counsel at trial." [Citation.]' ([*Id*.] at p. 699.)"  (*Blackburn*, *supra*, at p. 1133.)  In such circumstances, *Blackburn* observed, the reviewing court could not " 'simply excise some item of evidence in order to "make an intelligent judgment" [citation] about whether the competency determination might have been affected by the absence of counsel to represent defendant.' "  (*Ibid*.)  There was no reasoned manner in which to assess the effect of the absence of counsel, the court decided, " 'because the lack of true adversarial testing denied [the] defendant the basic procedure by which his competence should have been determined.' [Citation.]"  (*Ibid*.; see also, *People v. Sivongxxay* (2017) 3 Cal.5th 151, 179 [standard "contemplates a limited class of structural errors, consisting of ' "[t]he kinds of errors that, regardless of the evidence, may result in a 'miscarriage of justice' because they operate to deny a criminal defendant the constitutionally required 'orderly legal procedure' (or, in other words, a fair trial)—for example, the denial of the

23

defendant's right to a jury trial or to an impartial trial judge [citation]—[and] all involve fundamental 'structural defects' in the judicial proceedings . . ." ' "].)

Flint cites no case law concluding that automatic reversal is required following an evidentiary error concerning an expert's hearsay testimony. Our review confirms, to the contrary, that "the erroneous admission of expert testimony," including expert testimony containing inadmissible case-specific hearsay statements, is reviewed under the *Watson* standard. (*Conservatorship of K.W.*, *supra*, 13 Cal.App.5th at p. 1286; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 589; *Stamps*, *supra*, 3 Cal.App.5th at p. 997.) This is true even where the expert's testimony included multiple statements that were inadmissible under *Sanchez*. (Cf. *Conservatorship of K.W.*, *supra*, at pp. 1285–1286.)

Applying this standard, we note first that Sims's testimony on these points was relatively brief. While his entire testimony consumed 218 transcript pages, the challenged portions comprise no more than 16 pages. Further, our review confirms that, with one exception, Sims's inadmissible case-specific hearsay testimony, based on out of court statements contained in reports he read, merely duplicated other testimony to which Flint did not object.

In particular, Sims's hearsay testimony duplicated testimony by three of Flint's former victims, who confirmed facts and surrounding circumstances of Flint's prior offenses. Further, police and probation reports describing statements by two of the three testifying former victims upon which Sims relied, would have been independently admissible under section 6600, subdivision (a)(3),[15] which provides a statutory hearsay

---

[15] Section 6600(a)(3) provides in pertinent part: "The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals."

exception for "documentary evidence" regarding the details of the offenses that led to prior convictions. (*People v. Otto* (2001) 26 Cal.4th 200, 206–208 ["the only reasonable construction of section 6600(a)(3) is that it allows multiple-level hearsay to prove the details of the sex offenses for which the defendant was convicted"; "the Legislature apparently intended to relieve victims of the burden and trauma of testifying about the details of the crimes" and "may have also been responding to a concern that victims . . . would no longer be available"].) While the People admittedly did not introduce the police reports and probation reports containing such statements into evidence under this exception, the availability of that exception further underscores the lack of prejudice to Flint.

Sims's testimony also duplicated other testimony he provided about statements Flint made when Sims interviewed him, which were admissible as party admissions. (Evid. Code, § 1220.) Specifically, Sims testified Flint told him certain facts about his abuse of the four victims, that he had had an amphetamine problem, and that he entered and withdrew from some class or group that included members of the formal sex offender treatment program but did not himself join the formal program.

Finally, Sims testified about a fact included in the report of Flint's expert, psychologist Abbott—i.e., that Flint admitted having masturbatory fantasies about one of his young victims, which intruded on his relationship with his wife—but Abbott also provided testimony on this point. Abbott's testimony about what Flint told him was admissible as relaying a party admission. (Evid. Code, § 1220.)

Flint does not suggest Sims's hearsay testimony offered any facts not included in the unchallenged testimony that it duplicated. Because Sims's case-specific hearsay testimony duplicated other admissible evidence, the evidentiary error in permitting it was harmless under the standard stated in *Watson*, *supra*, 46 Cal.2d at p. 836. (*People v. Kopatz* (2015) 61 Cal.4th 62, 86–87; *People v. Reed* (1996) 13 Cal.4th 217, 230–231.)

The sole exception—the one instance in which Sims testified to a case-specific fact not otherwise covered by unchallenged testimony—also was harmless under *Watson*, to the extent it qualified as inadmissible hearsay. In that instance, Sims testified that Flint corresponded, while he was in prison following his conviction for his first offenses, with the mother of his later victim. As Sims did not state the source of his information on this point, we cannot determine whether he relied on information Flint supplied (i.e., an admissible party admission) or on inadmissible hearsay contained in a report. In any event, the testimony was not so significant that there was a reasonable probability the jury would *not* have found Flint to be an SVP if the testimony had been excluded. The point was relevant to whether Flint was likely to engage in sexually violent conduct that was predatory if released. (§ 6600, subd. (e).) As noted, "predatory" includes an act "directed toward . . . a person of casual acquaintance with whom no substantial relationship exists, *or* an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (*Ibid*., italics added.) Sims had testified that, in his opinion, Flint's victims all qualified as casual acquaintances, and, if credited by the jury, this would have satisfied the predatory element. One of Flint's victims also had testified that Flint gave her candy and a ride in his truck, and this also arguably demonstrated predatory conduct. Sims's testimony that Flint wrote to the later victim's mother, possibly with the intent of having a connection to the victim, therefore, was not essential to the People's case and on its own was harmless.

We are unconvinced by Flint's argument that the People's case would have been fatally weakened if Sims's case-specific hearsay testimony had been excluded, because, as discussed, that testimony duplicated other admissible evidence, including testimony from three of Flint's past victims, two of whom Flint elected not to cross-examine, and

26

testimony recounting Flint's own admissions on various points.[16] Nor do we agree that, having heard the prior victims' testimony, the jury would have given significantly less weight to Sims's testimony had it been offered in response to proper hypothetical questions.

Flint submits the error must be considered prejudicial because this was a "close case." It was a close case, he contends, because he presented the testimony of two expert witnesses who concluded he was not an SVP, and who criticized Sims's methodology. If not for Sims's "extensive case-specific hearsay," Flint contends, a reasonable jury easily could have reached a different result. We are not persuaded, however, either that a disagreement among experts signals a close case, or that it is reasonably probable Sims's case-specific hearsay testimony, duplicating other unobjected to testimony, here tipped the scales. By way of comparison, in *Jeffrey G.*, *supra*, this court concluded the introduction of unsupported case-specific expert testimony, in a case involving the conditional release of a criminal defendant following his NGI commitment, was prejudicial based in part on the fact that *the trial court there expressly found the decision to be a "close call,"* signifying that relatively small changes in the record could be important. (*Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 511, italics added; see also *id*. at p. 505.) Here, in contrast, the trial court made no such finding.[17] Accordingly, we reject Flint's argument that the evidentiary error was prejudicial.

---

[16] Our analysis of prejudice does not rely on the existence of corroborating evidence supplied by Flint's compelled trial testimony.

[17] Flint also submits that Sims's "version of the facts was not exactly the same" as the versions that Flint and the victims supplied in their respective testimony, and suggests the People's case therefore would not "have inspired confidence." As he does not develop this argument by identifying specific differences in the testimony, citing to the record where the differing testimony appeared, and explaining the significance of the differences, we cannot evaluate this argument. (See, e.g., *Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282 ["An appellate court 'will not develop the appellants' argument for them' "]; *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th

27

C. Cumulative Error

Finally, Flint contends the commitment order should be reversed for cumulative error. We have already concluded that any error in compelling Flint to testify was prejudicial. A new SVP civil commitment hearing will be required, therefore, if, on remand, the trial court determines the differential statutory treatment of SVP's and NGI's was not justified, signifying that it was error to compel Flint to testify. Absent such a finding, the only error was that under *Sanchez*, which we have already determined was not prejudicial. We therefore reject Flint's claim of cumulative error.

## III.    DISPOSITION

The matter is remanded to the trial court for further proceedings. On remand, the trial court is directed to conduct an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's discussed herein is justified. If the trial court determines the People have carried their burden to do so, it shall confirm its order finding Flint an SVP and committing him to DSH. If it determines the People have not carried their burden, the trial court shall conduct a new hearing under the SVPA to determine whether Flint is an SVP.

---

574, 590 & fn. 8 ["courts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted"].)

28

_____

Schulman, J.[*]

We concur:

_____

Streeter, Acting P.J.

_____

Reardon, J.

_____

[*] Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Flint* (A144631)

_People v. Flint_ (A144631)

| Trial Court: | Mendocino County Superior Court |
| --- | --- |
| Trial Judge: | Honorable Ann Moorman |
| | |
| Counsel for Defendant & Appellant: | Rudolph G. Kraft, by appointment of the Court of Appeal under the First District Appellate Project. |
| Counsel for Plaintiff & Respondent: | Kamala D. Harris and Xavier Becerra, Attorneys General; Gerald A. Engler, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Laurence K. Sullivan, Supervising Attorney General, Bridget Billeter and Moona Nandi, Deputy Attorneys General. |