Filed 7/9/19; pub. order 8/2/19 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN WAYNE CALHOUN,<br><br>    Defendant and Appellant. | G055511<br><br>(Super. Ct. No. 16CF2487)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge. Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

## INTRODUCTION

John Wayne Calhoun recruited 13-year-old D.T. into prostitution, acted as her pimp, treated her violently, and engaged in sex acts with her. A jury convicted him of human trafficking of a minor, pimping a minor under the age of 16, pandering a minor under the age of 16, lewd and lascivious acts on a child under the age of 14, unlawful sexual intercourse, and oral copulation of a child under the age of 14. The jury found true an allegation that Calhoun unlawfully used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury in committing the crime of human trafficking. The trial court sentenced him to 15 years to life in prison with a consecutive term of six years for one count of committing a lewd and lascivious act on a child under the age of 14 and a consecutive term of two years for another count of the same offense.

We affirm. As to each of Calhoun's contentions, we conclude: (1) the trial court did not err by excluding evidence of D.T.'s acts of prostitution occurring after Calhoun was placed in custody; (2) the evidence at the preliminary hearing imparted notice to Calhoun of the factual basis for counts 6 and 7 sufficient to satisfy due process; (3) venue in Orange County was proper; (4) the trial court did not err by admitting evidence of certain text messages; (5) expert testimony on statements made by D.T. during a police interview and on the content of text messages was admissible and any error was harmless; and (6) the trial court did stay execution of sentence on counts 2, 3, and 5 pursuant to Penal Code section 654.

## FACTS

### I.

### Calhoun Turns 13-Year-Old D.T. into a Prostitute.

D.T. was born in October 2002. She was placed in foster homes or group homes beginning in October 2015 because her father physically and emotionally abused her and had a substance abuse problem. In May 2016, she ran away from a group home

2

in Victorville and went with a friend to visit a man named Raymond, who happened to be Calhoun's cousin. At Raymond's house, D.T. met Calhoun. She spent the night at Raymond's house, and in the morning Calhoun gave D.T. and her friend a ride to a store. D.T. and Calhoun waited in the car while her friend went inside the store. Calhoun asked D.T. how old she was. D.T. told him she was 21 years old.

After returning to Raymond's house, D.T. and Calhoun talked for several hours. Calhoun said he was 30 years old. He asked D.T. if she "had ever made money before." D.T. did not know what he was talking about and answered no.

Calhoun asked D.T. to go with him to the home of Anntaneisha Louie, whom Calhoun called "Auntie," in San Bernardino. D.T. agreed. When they arrived at Louie's house, D.T. waited in the car while Calhoun went inside. Calhoun returned with women's clothing, which he said were for D.T. While at Louie's house Calhoun again asked D.T. if she "had ever made money." When she asked what he meant, he asked her if she "had ever slept with people to get money." She told him no.

After spending several nights at Louie's house, Calhoun drove D.T. to Ontario, California, where he picked up two women at an apartment complex. Each woman carried a bag of clothing. Calhoun drove D.T. and the women to a hotel in Los Angeles. The next morning, Calhoun told D.T. to get up and take a shower. When she got out of the shower, some of the clothes the women had brought were laid out on the bed. Calhoun selected a dress and told D.T. to put it on. D.T. did as she was told. Calhoun, along with D.T., took the two women back to Ontario. When D.T. asked Calhoun who the women were, Calhoun said it was none of her business.

Calhoun and D.T. returned to Louie's house, where Calhoun told D.T. he wanted to take photographs of her and post them on Backpage, an online website for advertising prostitution services. D.T. did not want to do it, but she was scared of what Calhoun might do if she said no, so she agreed. Calhoun took photographs of D.T.

wearing lingerie and posted the photographs on Backpage. D.T. did not object because she did not want Calhoun to believe she did not want to do it.

About one hour later, Calhoun received a text message in response to the Backpage posting. He drove D.T. to a house in San Bernardino to meet the customer. On the way, Calhoun gave her a price list for various sex acts and went over some of the rules of the trade. He gave D.T. a condom and told her to always use one. He asked her to call him "Daddy" and told her to immediately delete any text messages they exchanged so the messages would not be available if police ever looked through her phone.

When they arrived, Calhoun parked down the street, said he would wait in the car, and told D.T. to text him when she went inside. D.T. performed the requested sexual act and was paid $80. She did not want to do it but she did not want Calhoun to be angry with her. She gave the money to Calhoun.

Calhoun drove D.T. back to Louie's house, where D.T. was given some clothes. He then drove her to G Street, known as a "track" or "blade" (an area frequented by prostitutes) in San Bernardino. Calhoun told her he was "going to put her down on G Street" where she "was to make money for him." He gave D.T. three condoms, ordered her out of the car, and told her to complete three sex acts and give the money to him. She did as she was told and turned the money over to Calhoun.

Calhoun and D.T. returned to Louie's house. Calhoun left and instructed D.T. to stay there until he returned. D.T. did not want to be alone and texted a friend named Michael. He picked up D.T. and took her to his house. When D.T. arrived at Louie's house, Calhoun asked her where she went. She did not want to tell him the truth because he had ordered her not to talk to any other African-American men (he had told her that any African-American man who tried to talk to her was likely another pimp). D.T. told Calhoun that she had gone to visit her aunt. He accused her of lying and ordered her to go outside. D.T. and Calhoun left and got into his car. He punched her in

the left eye (giving her a black eye), and told her not to lie to him again. They spent the night at Louie's house and had sexual intercourse with each other for the first time.

Calhoun left Louie's house the next morning and again told D.T. to stay there until he got back. D.T. was angry with Calhoun for leaving without saying where he was going. She sent a text message to her friend Markell Stewart and asked him to come and get her. While D.T. was with Stewart, Calhoun sent her text messages instructing her to return to Louie's house. D.T. sent a text message to Calhoun that she was staying with her aunt but she spent the night with Stewart in Victorville. The next day, Stewart dropped D.T. and another woman off along G Street. D.T. walked G Street looking for customers so that she would have money to give Calhoun.

## II.

### D.T. Is Detained and Interviewed by Police Detectives.

On May 10, 2016, San Bernardino Police Detective Kimberly Hernandez was driving a marked patrol car westbound on 9th Street approaching G Street in the City of San Bernardino. She pulled over a vehicle driven by Stewart because it had tinted windows. Hernandez searched the vehicle and found two cell phones in the center console. One cell phone was a white HTC brand and the other was a black Vortex brand. Hernandez also found, in the back seat of the car, women's clothing of the type typically worn by prostitutes in the area. Hernandez confiscated the two cell phones.

Once the traffic stop was concluded, Hernandez continued patrolling the area. While driving southbound on G Street she saw a woman (K.V.), whom she recognized from an identification card found in Stewart's vehicle. Hernandez also noticed that K.V. was walking with a very young girl whom Hernandez had not seen before. At trial, Hernandez identified the young girl as D.T. Hernandez believed that K.V. and D.T. were working as prostitutes and made contact with them.

5

D.T. identified herself by a false name and told Hernandez she was 20 years old. Hernandez observed D.T. had a ZTE brand cell phone and two condoms sticking out of her back pocket. Hernandez placed D.T. in the back of the patrol car and took her to the police station. While in the patrol car, D.T. revealed her true name and age and stated she had run away from a group home.

At the police station, Hernandez and a sheriff's deputy interviewed D.T. for over five hours. During the interview, D.T. identified Calhoun as her pimp and said she had been working for him for several months. She said Calhoun had driven her to several blades in San Bernardino and Orange County to work as a prostitute for him. She had been with Calhoun the previous day, but had left him and took his cell phones with her. Stewart had driven D.T. and K.V. to San Bernardino that day. D.T. said Calhoun had "laid his hands on her" many times, recently had "socked her in the jaw," and was mean to her and did not respect her. Calhoun expected her to earn $500 to $600 in San Bernardino and $900 in Orange County and if she did not make her "trap" (quota), Calhoun would "whoop her ass." Calhoun would apologize after striking D.T. but he did not change his behavior.

D.T. told Hernandez the two cell phones found in Stewart's vehicle belonged to Calhoun. She took the cell phones from Calhoun because she was upset with him and had left them in Stewart's vehicle. The white HTC cell phone was used to listen to music. The black Vortex cell phone was used for text messaging and had a contact with the name "Daddy" with Calhoun's photograph. D.T. said she used the black Vortex cell phone to communicate with Calhoun.

Hernandez obtained permission to look through the Vortex cell phone and D.T.'s ZTE cell phone. Hernandez reviewed the text messages and concluded they were consistent with pimping and prostitution. In the text messages, D.T. referred to Calhoun as John. The ZTE cell phone had a contact for "Daddy" with a photograph of Calhoun. Hernandez also noticed several text messages sent to Stewart's phone on May 10 and 11,

6

2016.  Some of the messages were consistent with pimping and prostitution.  Hernandez noticed there were 90 calls made between D.T. and Stewart from May 9 through May 11, 2016.

D.T. said that, on the previous day, Calhoun had been repeatedly calling her and leaving threatening voicemail messages.  He demanded she return his cell phones, and called her a "ho," a "slut," and a "bitch."

At the conclusion of the interview, Hernandez released D.T., who was subject to a custody warrant, to Riverside County Child Protective Services.  The next day, Hernandez took photographs of D.T.'s Facebook messages from May 12, 2016, which were depicted in exhibit 20.  From the Facebook messages, it appeared D.T. had contacted Calhoun and referred to him as Daddy.

### III.

### D.T. Returns to Prostitution with Calhoun as Her Pimp.

D.T.'s social worker picked up D.T. from the police station.  At some point, D.T. asked the social worker to stop the car.  When the car stopped, D.T. got out and ran to a gas station where Calhoun had agreed to pick her up.  Calhoun was angry and slapped D.T. in the face.  He drove her to Louie's house and told her never to leave him again.

Shortly after returning to Louie's, Calhoun and his cousin Joseph drove D.T. to Figueroa Street in Los Angeles, an area known for prostitution activity.  Calhoun had told D.T. he was going to "put [her] down on Fig in L.A." so that she would "make money for him."  Calhoun gave D.T. three condoms and told her to complete three sex acts and to text him before each one.  D.T. completed oral sex with three customers and gave Calhoun the money she had earned.

7

Calhoun and D.T. returned to Louie's house where, that night, they engaged in sexual intercourse. D.T. testified she had sexual intercourse with Calhoun at least four times and oral sex with him twice. She was 13 years old at the time.

Calhoun told D.T. they would travel to San Francisco because it was easier to make money in San Francisco than it was in San Bernardino or Los Angeles. D.T. did not want to prostitute herself in San Francisco, but she did not want to say so to Calhoun for fear he would get angry and hit her. The next morning, Calhoun drove D.T. to San Francisco, where they stayed for three days at his cousin's house. He posted two ads on Backpage and introduced D.T. to another prostitute named "Heaven."

Calhoun and D.T. got into an argument while staying with his cousin. Calhoun put his hands around D.T.'s neck and choked her. She had difficulty breathing, passed out, fell, and scratched her right arm on a couch. When she regained consciousness, Calhoun was standing over her. He said, "Look what you made me do" and ordered D.T. to go to the car and clean up her arm.

After the third night, Calhoun drove D.T. back to Louie's house. He left after telling her to stay at the house. While Calhoun was gone, D.T. sent a text message to a friend, who came to the house and picked her up. When Calhoun returned and found D.T. gone, he sent her text messages asking her why she had left. The next morning, the friend drove D.T. back to Louie's house so that D.T. could retrieve some personal items. When D.T. went inside, Calhoun told her to go to the bathroom, pulled her by the arm, and demanded to know where she had been. D.T. said she had been at her aunt's house. Calhoun told D.T. to stop lying, backhanded her, and punched her several times in the face. She fell backwards into the bathtub and, when she tried to get up, Calhoun struck her in the right eye. D.T.'s nose started bleeding. Calhoun told her to clean up and get out.

As D.T. walked outside, she received a telephone call from Calhoun's cousin Joseph. After she ended the call, Calhoun stepped outside and asked who had

8

called.  D.T. responded, "nobody."  Calhoun snatched the phone from D.T., looked through it, and discovered text messages between her and Joseph.  Calhoun threw the phone to the ground, slapped D.T. in the face, and accused her of lying.  She fell and, when she tried to get back up, Calhoun slapped her again, threw her back down, and choked her.

The next day, Calhoun told D.T. he had rented a room in San Bernardino from a friend so they would have a place to stay.  After they moved some boxes into the room, Calhoun left and told D.T. to stay there and unload boxes.

That night, Calhoun picked up another woman and told D.T. the three of them were going to Orange County to make money.  D.T. agreed because she was afraid he would hit her again.  Calhoun drove to Harbor Boulevard and Hazard Avenue in Santa Ana, parked on a side street, gave D.T. three condoms, and told her to go out and make money for him and call him when she was finished.  The other woman stayed in the car with Calhoun.

D.T. completed one act of vaginal intercourse and another act of oral sex.  Calhoun had her charge $120 for the first and $80 for the second.  D.T. gave Calhoun the money.  After taking D.T. to get something to eat, Calhoun drove back to Harbor Boulevard and Hazard Avenue, gave D.T. three more condoms, and ordered her out of the car.  As Calhoun had instructed, D.T. walked along Harbor Boulevard and waved at tricks to get their attention.

### IV.

**D.T. Is Detained in Santa Ana for Prostitution;
Calhoun Is Arrested.**

On June 2, 2016, at about 3:06 a.m., Santa Ana Police Officer Robert Velasco was patrolling the area of Harbor Boulevard and Hazard Avenue in Santa Ana.  The area is known as the Santa Ana Blade and is well known for pimping and trafficking

9

of juveniles. Velasco had conducted over 100 pimping and prostitution investigations during his four and a half years as a police officer.

Velasco noticed a very young woman walking along Hazard Avenue just west of Harbor Boulevard. Because she looked extremely young and the area was known for trafficking juveniles, Velasco pulled up and parked the patrol car alongside her. He approached the young woman and asked her for her name and date of birth. She gave a false last name and claimed she was born in October 1997. Velasco later learned the young woman was D.T. When two records checks did not uncover any information for her name or date of birth, Velasco told D.T. he knew she was a juvenile and was lying to him. He asked her for proof of her name and birthdate but D.T. had no identification with her.

Velasco asked D.T., who appeared nervous and scared, why she was out walking at 3:00 a.m. She said she was walking home but said she did not know her home address. When Velasco asked her why she did not know her home address, D.T. said she was going to her cousin's house. D.T. did not know the cousin's name or address.

Velasco asked D.T. if he could look through her cell phone, which was a brand "BLU." D.T. agreed and gave him the phone. While Velasco was searching through the cell phone, a text message came through at 3:11 a.m. from a contact named John saying "WYA," which means "where are you at?"

Velasco told D.T. he knew she was working as a prostitute. D.T. then admitted she had been working as a prostitute for a couple of months and was from San Bernardino, but had been to Santa Ana three to four times to work as a prostitute. She said her friend named John, who had just texted her, had given her a ride from San Bernardino to Santa Ana.

Velasco examined the text message thread between D.T. and John and recognized several messages indicating a pimp/prostitute relationship. One such message began with the words "Good morning, daddy," which is significant because it is common

10

for a prostitute to call her pimp "daddy." Other such messages were "Get him for 200" and "He will if get try and fuck 250." These messages suggested to Velasco that a pimp was helping D.T. negotiate prices for services. Velasco saw text messages reading: (1) "Eating yo pussy extra"; (2) "Tell him he do T.G.E. 250"; (3) "You can have a room available"; and (4) "He gave me 100." According to Velasco, the first two messages were the pimp helping to negotiate the price, the third message was the pimp telling the prostitute he would provide a room to perform the sex act, and the final message was the prostitute informing the pimp she had completed the sex act and she had the money.

Officer Velasco also saw a message thread reading: (1) "He want me to come to Long Beach he said if he got a room"; (2) "He talking big money"; (3) "Okay"; and (4) "What's my name to him?" Velasco concluded the first two messages were the pimp setting up a date for the prostitute.

After reading these messages, Velasco and D.T. went to find John. D.T. told Velasco that John was driving a green four-door Honda Accord and that he might be in the area of Hazard Avenue and Bewley Street. Velasco placed D.T. in the back of his patrol car and drove to that area. Velasco eventually found the green Honda Accord in the area of Hazard Avenue and West Street in Santa Ana.

Velasco parked directly behind the Honda, got out of his patrol car, and with his partner Officer Phan, made contact with the two occupants. Calhoun was in the driver's seat. The passenger was released without being interviewed. Velasco dialed the number listed for "John" in D.T.'s phone, and Calhoun's cell phone rang. During a search of Calhoun's car, $99 was found.

Velasco had Calhoun step out of the car and detained him. Calhoun was holding a blue, Samsung Galaxy cell phone. Calhoun confirmed the phone belonged to him.

After detaining Calhoun, Velasco further questioned D.T. She told Velasco she had been working in Santa Ana for less than an hour. She confirmed that "John" was

11

the man seated in the driver's side of the Honda, described him as a friend, and said he drove her to Orange County from San Bernardino because she had no other way to get here. She said Calhoun keeps track of and protects her, she gives him gas money, and the $99 the officers found was her money that she had given to Calhoun to hold. She claimed Calhoun was not her pimp and had done nothing wrong, although he knew she was working in Santa Ana as a prostitute.

At the police station, an officer named Gibbons obtained D.T.'s correct age, name, and date of birth. D.T. was arrested for lying to a peace officer and was sent to juvenile hall. Anaheim Police Investigator Happy Medina interviewed D.T. at juvenile hall. She told him Calhoun was her pimp.

## V.

### Expert Testimony on Human Trafficking and Pimping

Medina testified as an expert in pimping, pandering, and human trafficking. He also testified about the rules governing the pimping and pandering subculture. For instance, if the pimp is African-American, the prostitute is prohibited from looking at other African-American men for they might also be pimps. The prostitute must do whatever the customer asks her to do. Some services cost more than others. The pimp dictates everything the prostitute does.

A quota is an amount set by a trafficker or pimp which his prostitutes must earn in a day. A quota can be anywhere from $250 to $2,000 a day. A prostitute is not permitted to stop working until she has made the quota. The earnings are called a "trap." After the prostitute engages in a couple of sex acts, the pimp takes the trap to prevent her from getting robbed or keeping some for herself.

Pimps generally give the prostitutes condoms three at a time so the pimps can control the number of sex acts. After every three sex acts, the prostitute must go back to the pimp's location, turn over the money, and get more condoms. The prostitute

12

will send a text message to the pimp when the sex act is starting and tell the pimp how much the customer will be paying. The pimp waits nearby. If a prostitute comes into contact with police, the pimp expects her "100 percent to lie" about their relationship. The prostitute is permitted to say she gives her pimp money and he drives her to the track, but, even if arrested, is never to disclose that she has a pimp.

Most communications between a prostitute and a pimp are made through text messaging. Medina has spoken to prostitutes who were told to delete all text messages and believes that practice is common. Pimps post advertisements for their prostitutes on various websites, such as Backpage and Craigslist. The pimp will use a false name for the prostitute and, if she is a minor, lie about her age. The pimp will photograph the prostitute for the advertisement and dictate what the prostitute wears and how she poses. The advertisement will ask the potential customer to send a text message to the pimp, who is posing as the prostitute. All of the arrangements are made through the pimp.

There are several styles of pimping and recruitment of prostitutes. The most common style is called the "boyfriend pimp" in which the pimp pretends to develop a normal boyfriend/girlfriend relationship with a girl, but the pimp's motive is to turn her into a prostitute. This style is most successful on girls who have not been prostitutes in the past. A "finesse pimp" is similar to a boyfriend pimp but uses charm to nurture young girls. By contrast, a "guerilla pimp" is one who predominately engages in force and violence to control the prostitute. Pimps can use more than one style; for example, at times, a boyfriend pimp may become violent.

A majority of the girls who become prostitutes have no father figure or male role model in their lives and many also have suffered personal trauma such as physical or sexual abuse. Most of girls who become prostitutes have a history of being in group homes or foster care, or running away from home. Girls have told Medina they were recruited directly out of foster care, placement facilities, and juvenile hall, where

13

they overall had bad experiences. Girls who lived in those conditions are "longing for that attention, some kind of stability in their lives," and pimps will tell them "all the things they have been waiting to hear."

"Daddy" is a very common term used by prostitutes to refer to their pimps. It connotes a father figure, protector, nurturer, and the person who lays down the rules and sets the boundaries.

A pimp expects a prostitute to have sex with him "on demand." The prostitute is expected to view sex with the pimp as "sort of a reward, something that you get to do with daddy." Medina had spoken with prostitutes who do not want be in that trade but nevertheless stayed with the same pimp. The girl stays because she has nowhere else to go and no other way to earn money, and accepts prostitution as her fate. She views the pimp, even if he is abusive, as the only person who accepts her for who and what she is.

Medina also looked at photographs downloaded from Calhoun's Samsung Galaxy cell phone. One photograph depicted Calhoun in a vehicle holding $100 bills. In more than one photograph, D.T. was in the back seat of the car. These photographs were of a type commonly taken by pimps, panderers, and human traffickers.

## VI.
### Expert Testimony on Cell Phone Records

Expert testimony was offered on the subject of cell phone records and data. The following is a breakdown of the various cell phones in this case:

HTC: The white cell phone found in the center console of Stewart's vehicle. D.T. told Hernandez this phone belonged to Calhoun.

Vortex: The black cell phone found in the center console of Stewart's vehicle. It belonged to Calhoun but was used by D.T. Hernandez identified the

14

Cellebrite report for the Vortex cell phone as exhibit 19. Cellebrite is a forensic download or collection of data from a cell phone.

ZTE: The personal cell phone used by D.T. at the time she was detained by Hernandez in May 2016. The Cellebrite download report is exhibit 34.

Stewart's cell phone: The cell phone used by Stewart and apparently confiscated by police in May 2016.

BLU: The personal cell phone used by D.T. at the time Calhoun was detained. Exhibit 21 is the Cellebrite download of text messages from this phone. Exhibit 22 identifies text messages on this cell phone to and from the contact "my baby heaven." Exhibit 23 identifies text messages on this phone to and from the number (xxx) xxx-7157.

Samsung Galaxy: The cell phone Calhoun was holding when he was detained by Velasco. Exhibit 24 is the Cellebrite download report for this cell phone.

In addition, there were messages and data pertaining to an unrecovered cell phone with the number (xxx) xxx-5542.

Bruce Linn is an investigator with the Orange County District Attorney's Office and qualified as an expert in cell phone technology. Linn is assigned to the "TRACKRS" unit, which stands for "task force review aimed at catching killers, rapers [*sic*], and sexual offenders." He conducted a forensic analysis of a Cellebrite download from the Samsung Galaxy cell phone recovered from Calhoun.

Linn is able to determine from data downloaded from a cell phone where it has been because the internal components of a cell phone produce GPS coordinates. A photograph taken by a cell phone camera produces metadata of the latitude and longitude lines identifying the camera's location when the photograph was taken.

Linn was provided a Cellebrite download from the Samsung Galaxy cell phone recovered from Calhoun. He determined that only a portion of the photos had location data. Based upon the chronology of the photos from earliest-dated to most

15

recent, he inputted the latitude/longitude into Cell Hawk, which created the map showing where the photographs were taken. Linn reviewed all the photographs in the Cellebrite download and noticed Calhoun appeared in most of the photographs. Linn also noticed videos in the Cellebrite download depicting Calhoun.

At trial, Linn gave a presentation on PowerPoint showing a map, date, time, and latitude and longitude coordinates of 61 photographs and two videos. The presentation showed that during the relevant time period, Calhoun was in San Bernardino, Riverside, Modesto, San Jose, San Francisco, Santa Ana, Los Angeles, and Long Beach.

During his investigation, Linn downloaded data from D.T.'s BLU cell phone using Cellebrite. He noticed two separate photographs were take on May 17, 2016 at 11:52 a.m. on both D.T.'s cell phone and Calhoun's cell phone at the same location near Richmond Point in the San Francisco Bay area.

Detective Hernandez, who had detained D.T. in May 2016, testified about text messages retrieved from the two cell phones found in Stewart's car (the HTC cell phone and the Vortex cell phone), D.T.'s BLU cell phone, and Stewart's own cell phone. Hernandez was familiar with Cellebrite downloads and had Cellebrite downloads conducted on all of those cell phones.

D.T. had told Hernandez that she used the Vortex cell phone to communicate with Calhoun. Hernandez testified the Vortex cell phone had a contact under the name "Daddy" with a corresponding phone number of (xxx) xxx-5542. Text messages exchanged between D.T. and Calhoun related to pimping and prostitution. For example, in one message thread, D.T. sent a message advising Calhoun she had a customer. He replied, "Keep walking." She then asked Calhoun how long she had to remain on the blade and if she could take a break and talk to a friend of hers. Calhoun ordered her immediately to stop talking to the friend.

16

Hernandez was not sure to which cell phone the number (xxx) xxx-5542 was connected. She did not believe that number was associated with either the HTC phone or the Vortex phone. D.T. saved that number under the contact "Daddy." On May 12, 2016, Calhoun had told D.T. he had a new phone number.

Medina testified he was familiar with Cellebrite downloads and reports and had reviewed the cell phone downloads from the Samsung Galaxy, the BLU, the Vortex, the HTC, and the ZTE cell phones. Medina also reviewed exhibit 35, which is a collection of text messages to or from the "Daddy" contact with the number (xxx) xxx-5542. Medina read one incoming message from the Daddy contact: "Don't give no fuck. Give me my phones. I need my white one. I'm not playing."

Medina identified text messages on the Vortex cell phone to or from the contact Daddy with the number (xxx) xxx-5542. Outgoing messages are addressed to "Daddy" or "John." The messages relate to pimping and prostitution activities. One incoming text message read, "Come get this condom" and an outgoing message read, "Daddy, hows much long I got to be out here and OK." Medina testified the question about how much longer she had to be out was consistent with a pimp controlling the prostitutes working on the track and "okay" meant the girl would meet the pimp to get condoms. The next message read, "We need at least 100," and was significant because it told the girl she had to make at least $100 before she could stop working.

Medina identified and reviewed exhibit 33, the Cellebrite report for the ZTE cell phone. Medina testified the BLU cell phone had outgoing text messages that were consistent with pimping, pandering, and human trafficking. In one message, D.T. texted, "Baby, I want to make up with you. Imma give you the best . . . sex ever, babe. I'm sorry for today." In another, she sent the following text message to the contact listed as John: "Good morning, Daddy. I hope you have a great day today. I'm sorry for everything I have been doing wrong. You are the best thing that ever happened to me. And when I say that I want to spend the rest of my life with you, I mean it Babe. Just

17

know that I love you so much." Those messages were consistent with the common practice of a victim apologizing to her pimp after a fight.

Another message thread was between D.T. and her friend Heaven. D.T. sent a message stating, "Heaven, what you doing? I'm in Oakland making my money. And it's for Daddy. Pockets." Heaven responded, "Be safe tonight. What part of Oakland you in?" D.T. replied back that she was on "International," a well-known track in Oakland. Later, D.T. texted Heaven and told her that she was about to get on the freeway and head back to San Bernardino. Heaven asked D.T. where "John" was. When D.T. sent a message back that he was "right here," Heaven's response was, "Tell him [to] answer my text. It's important." Medina testified those communications were consistent with contacts between two women working for the same pimp.

### SUMMARY OF VERDICT AND SENTENCES

The jury found Calhoun guilty of one count of human trafficking of a minor under the age of 18 (count 1, Pen. Code, § 236.1, subd. (c)(1)),[1] one count of pimping of a minor under the age of 16 (count 2, § 266h, subd. (b)(2)), one count of pandering a minor under the age of 16 by procuring (count 3, § 266i, subds. (a)(1) & (b)(2)), two counts of lewd and lascivious acts on a child under the age of 14 (counts 4 & 6, § 288, subd. (a)), unlawful sexual intercourse (count 5, § 261.5, subd. (d)), and oral copulation with a child under the age of 14 (count 7, § 288a, subd. (c)(1)). The jury found true the allegation under section 236.1, subdivision (c)(2), made with respect to count 1, that Calhoun unlawfully used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury in committing the crime. Following a bench trial, the court found a prior conviction allegation to be true.

The court sentenced Calhoun as follows: (1) 15 years to life under count 1 as enhanced by the true finding on the section 236.1 allegation; (2) six years on count 4,

---

[1] Undesignated code citations are to the Penal Code.

consecutive to count 1; (3) two years on count 6, consecutive to count 1; (4) two years on count 7, concurrent to count 1; (5) six years on count 2, concurrent to count 1; (6) six years on count 3, concurrent to count 1; (7) three years on count 5, concurrent to count 1. The court stayed execution of sentence on counts 2, 3, and 5 pursuant to section 654.

## DISCUSSION

### I.

### The Trial Court Did Not Err by Excluding Evidence of D.T.'s Acts of Prostitution Occurring After Calhoun Was Placed in Custody.

Calhoun contends the trial court erred by not permitting him to introduce evidence that D.T. continued to work as a prostitute after he was placed in custody. The trial court concluded such evidence was inadmissible under Evidence Code section 1161, subdivision (b) (Evidence Code section 1161(b)) and, if admissible, was subject to exclusion under Evidence Code section 352. Evidence Code section 1161(b) reads: " Evidence of sexual history or history of any commercial sexual act of a victim of human trafficking, as defined in Section 236.1 of the Penal Code, is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."

Calhoun argues the evidence of D.T.'s subsequent prostitution activity was relevant and admissible because: (1) Evidence Code section 1161(b) only excluded evidence of D.T.'s sexual history and history of commercial sexual acts that occurred before he was placed in custody and (2) he sought to admit evidence of D.T.'s subsequent commercial sex acts and prostitution arrests not for credibility or impeachment purposes but to negate an element of the offense of human trafficking. Calhoun also contends the trial court never made an express finding that D.T. was a victim of sex trafficking.

19

## A. *Background*

Before trial started, the prosecution moved to exclude evidence of D.T.'s prior or subsequent acts of prostitution for purposes of impeachment. Defense counsel stated he wanted to impeach D.T. with evidence of acts of prostitution committed after Calhoun was placed in custody. Defense counsel argued prostitution is a crime of moral turpitude, there was no causal connection between Calhoun and the acts of prostitution committed by D.T. after Calhoun was in custody, and Evidence Code section 1161(b) did not apply because the People had made no preliminary showing that D.T. was a victim of human trafficking. The trial court ruled that Evidence Code section 1161(b) barred the defense from introducing evidence of subsequent acts of prostitution for the purpose of impeaching D.T. or challenging her credibility.

During a break in D.T.'s cross-examination, the trial court returned to the issue of evidence of D.T.'s acts of prostitution after Calhoun had been placed in custody. The court stated: "There is so far uncontroverted testimony that [D.T.] had not been a prostitute until the defendant brought her into the business, this is from direct examination from the prosecution, the testimony that [Calhoun] caused it by having her make money, a term she stated that she had never heard before. Going into her subsequent sexual history as a prostitute is not relevant to the case. It is inflammatory. And even if [Evidence Code section] 1161 hypothetically did not exist, this would be a very simple [Evidence Code section] 352 analysis which also applies here because any probative value is outweighed by the prejudice. [¶] Now if that becomes an issue, we can talk about that. So far the only evidence that the witness prostituted herself was because of how the defendant taught her to do that. That's after the fact, after the defendant was arrested. According to her, he gave her the tools. The subsequent conduct does not become relevant at that point."

After the prosecutor had completed redirect examination of D.T., defense counsel asked the court to reconsider its ruling due to her testimony that Calhoun had

20

been her only pimp and was responsible for prostituting her to 20 customers.  Defense counsel argued that D.T.'s testimony created the misleading impression that she ceased engaging in prostitution once Calhoun was in custody.  The trial court confirmed its ruling that evidence of D.T.'s subsequent acts of prostitution was inadmissible under Evidence Code section 1161(b).

### B.  *The Evidence Was Inadmissible Under Evidence Code Section 1161(b) for Credibility or Impeachment of Character.*

Calhoun was charged with and convicted of human trafficking in violation of section 236.1.[2]  In November 2012, the voters of the State of California passed the Californians Against Sexual Exploitation Act (the CASE Act) with the purpose and intent "'[t]o combat the crime of human trafficking'" and "'[t]o recognize trafficked individuals as victims and not criminals, and to protect the rights of trafficked victims.'"  (*In re M.D.* (2014) 231 Cal.App.4th 993, 998-999, quoting Prop. 35, § 3, as approved by voters Gen. Elec. (Nov. 6, 2012) eff. Nov. 7, 2012.)  "The CASE Act made various changes to state law regarding human trafficking, including expanding the definition of the offense and increasing the punishment for such offenses."  (*In re Aarica S.* (2014) 223 Cal.App.4th 1480, 1486 (*Aarica S.*).)

Evidence Code section 1161 was enacted as part of the CASE Act.  (*In re M.D., supra,* 231 Cal.App.4th at p. 998.)  The full text of Evidence Code section 1161 is:

---

[2]  Subdivision (c) of section 236.1 defines the offense of human trafficking:  "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking.  A violation of this subdivision is punishable by imprisonment in the state prison as follows:  [¶] (1) Five, 8, or 12 years and a fine of not more than five hundred thousand dollars ($500,000).  [¶] (2) Fifteen years to life and a fine of not more than five hundred thousand dollars ($500,000) when the offense involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person."

"(a) Evidence that a victim of human trafficking, as defined in Section 236.1 of the Penal Code, has engaged in any commercial sexual act as a result of being a victim of human trafficking is inadmissible to prove the victim's criminal liability for the commercial sexual act.  [¶] (b) Evidence of sexual history or history of any commercial sexual act of a victim of human trafficking, as defined in Section 236.1 of the Penal Code, is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."

Evidence Code section 1161, subdivision (a) (Evidence Code section 1161(a)) in effect means a victim of human trafficking cannot be prosecuted for an act of prostitution that is causally connected to the victim's status as human trafficking victim. (See *Aarica S., supra*, 223 Cal.App.4th at pp. 1487-1488.)  Evidence Code section 1161(a) is not directly relevant here because D.T. was not prosecuted.  As we shall explain, it is relevant to interpreting Evidence Code section 1161(b).

The issue presented here is whether Evidence Code section 1161(b) applies only to the human trafficking victim's sexual conduct and acts of prostitution committed before the alleged human trafficker was placed in custody.  Calhoun argues that Evidence Code section 1161(b), by referring to "sexual *history*" and "*history* of any commercial sex act," only excludes evidence of D.T.'s conduct prior to his arrest.  (Italics added.)  The Attorney General argues that nothing in the text of the CASE Act limits the scope of Evidence Code section 1161(b) to sexual acts and acts of prostitution committed before the alleged human trafficker was placed in custody.  In resolving this question, we work on a blank slate.  No reported decision has addressed the scope of Evidence Code section 1161(b).

We review issues of statutory interpretation de novo (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916) including statutes added by the passage of a ballot initiative (*People v. Park* (2013) 56 Cal.4th 782, 796).  The primary purpose is to ascertain and effectuate the intent of the voters who passed the

ballot initiative. (*People v. Briseno* (2004) 34 Cal.4th 451, 459.) "'In interpreting a voter initiative . . . we apply the same principles that govern statutory construction. [Citation.] Thus, "we turn first to the language of the statute, giving the words their ordinary meaning." [Citation.] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] When the language is ambiguous, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet."'" (*Ibid.*)

The language of Evidence Code section 1161(b) renders inadmissible for impeachment or credibility purposes "evidence of sexual *history* or *history* of any commercial sexual act of a victim of human trafficking." (Italics added.) What does "history" mean?

History, both formally and colloquially, has several meanings. Formally, it can mean a "narrative of events connected with a real or imaginary object, person, or career" or "a systematic written account comprising a chronological record" or the formal "branch of knowledge . . . of human activities." (Webster's 3d New Internat. Dict. (2002) pp. 1073-1074.) History can mean simply a "tale, story." (Merriam-Webster's Collegiate Dictionary (11th ed. 2004) p. 590, capitalization omitted.) In everyday speech, history can mean events in the past or even reputation.

The various definitions of history all refer to events in the past, and Calhoun says history as used in Evidence Code section 1161(b) has the same meaning. But past of what? Calhoun says before he was taken into custody. Evidence Code section 1161(b) does not include such a limitation or any temporal limitation except for the word "history." We conclude the more reasonable interpretation is that "history" means at any time before the victim testifies at trial.

Evidence Code section 1161(b) says history of "*any* commercial sexual act." (Italics added.) Use of the word "any" suggests the inadmissible evidence is not

23

limited to commercial sexual acts committed by the victim while using the alleged human trafficker as the pimp.

Evidence Code section 1161(a) draws a causal connection between the sexual act and the victim's status as human trafficking victim by making inadmissible evidence that the victim "has engaged in any commercial sexual act *as a result* of being a victim of human trafficking." (Italics added.) Evidence Code section 1161(a) applies "only when there is a specific causal connection between the victim's status as a victim of human trafficking and the particularly commercial sex act at issue." (*Aarica S., supra*, 223 Cal.App.4th at pp. 1487-1488.) No similar language appears in Evidence Code section 1161(b). "If the Legislature has included one provision in one part of a statute but excluded it from another, a court should not imply the omitted provision in that part of the statute that does not contain it." (*People ex rel. Gwinn v. Kothari* (2000) 83 Cal.App.4th 759, 770.)

The Legislative Analyst stated that ballot initiative 35 "makes evidence of sexual conduct by a victim of human trafficking inadmissible for the purposes of attacking the victim's credibility or character in court." (Ballot Pamp., Gen. Elec. (Nov. 6, 2012), analysis of Prop. 35 by the Legislative Analyst, p. 44.) As the Attorney General argues, the language used by the Legislative Analyst encompasses all of the victim's sexual conduct.

One purpose of the CASE Act was to "'ensure just and effective punishment of people who promote or engage in the crime of human trafficking.'" (*In re M.D., supra,* 231 Cal.App.4th at p. 999.) At trial, Medina testified that victims of human traffickers are typically runaways who often had bad experiences in the juvenile dependency system. Once introduced to (or forced into) prostitution by the trafficker, the victim remains a prostitute because she has nowhere else to go and no other way to earn a living. The human trafficker, having forced the victim into a life of prostitution, should

24

not be permitted to use the victim's sexual history and history of prostitution to discredit the victim and exonerate himself.

Calhoun argues Evidence Code section 1161(b) requires the prosecution to prove the witness was in fact a victim of human trafficking before the sexual history and commercial sex history evidence can be excluded. Otherwise, he argues, Evidence Code section 1161(b) "would create a blanket privilege to all victims of human trafficking without the prosecution having to prove that the minor was in fact a victim of human trafficking." Calhoun relies on *In re M.D., supra*, 231 Cal.App.4th 993, in which the court interpreted Evidence Code section 1161(a) as placing the burden of proof on the minor defendant to prove she was a victim of human trafficking when she moved to exclude the evidence of her commercial sex acts. (*Id.* at p. 1001.) The court stated, "nothing in the language of [Evidence Code] section 1161 suggests an intent to create an evidentiary presumption that all minors *charged* with committing commercial sex acts are victims of human trafficking." (*Ibid.*, italics added.)

D.T. was not charged with prostitution or any offense in this case. Evidence Code section 1161(b) does not have the "as a result of language" found in Evidence Code section 1161(a). In *People v. Brown* (2017) 14 Cal.App.5th 320, 341, the court rejected the defendant's argument that by using the word "victim," Evidence Code section 1161(b) violated due process and the confrontation clause because, until a trial, "'no "victim" yet exists.'" The Court of Appeal concluded the word "victim" as used in Evidence Code section 1161(b) is synonymous with "'complainant,' 'complaining witness,' or the older term 'prosecutrix.'" (*Ibid.*) "[A]ny rational trial court would understand the context of the term, and would not presume the defendant was guilty before trial." (*Ibid.*)

In any case, the trial court did, in effect, make a preliminary finding that D.T. was a victim of human trafficking. During D.T.'s cross-examination, the court stated, "there is so far uncontroverted testimony that [D.T.] had not been a prostitute until

25

the defendant brought her into the business." The evidence at trial was overwhelming that D.T. was a victim of human trafficking and that Calhoun was the trafficker. D.T.'s own testimony to that effect was bolstered by the percipient and expert testimony of Hernandez and Medina. There could be no question that D.T. was a victim of human trafficking for purposes of Evidence Code section 1161(b).

It might be, as Calhoun claims, that D.T. was not a human trafficking victim in the subsequent acts of prostitution in the sense that she had no pimp or her pimp was not Calhoun. He argues that excluding evidence of subsequent acts of prostitution would make section Evidence Code 1161(b) "an affirmative defense to prostitution." Because D.T. was not on trial for prostitution, we are not considering whether or under what circumstances Evidence Code section 1161(b) evidence is admissible to challenge the credibility or impeach the character of a *defendant*. The important point here is D.T. was not the defendant but a witness testifying as a human trafficking victim against the man who, as a human trafficker, induced or forced her into prostitution. In that situation, section Evidence Code 1161(b) prohibited the introduction into evidence, for credibility or impeachment purposes, evidence of "*any*" history of commercial sexual act of the human trafficking victim.

C. *The Evidence Was Irrelevant to Negate an Element of Human Trafficking; Any Error in Excluding the Evidence Was Harmless.*

Calhoun argues evidence of D.T.'s commercial sexual acts was admissible to negate an element of the crime of human trafficking. The evidence, he argues, would negate the inducement, causation, and persuasion elements of section 236.1: "[A]ny evidence that the victim, subsequent to [Calhoun]'s arrest, is using other people to conduct her prostitution business would be relevant to whether the complaining witness is actually a victim of human trafficking in this case. If the evidence showed that [D.T.]

26

was an independent contractor and not the property of a pimp, it would have been relevant to demonstrate that she was an independent contractor with [Calhoun] as well."

Calhoun undoes his own argument when, in his appellant's reply brief, he asserts that evidence of D.T.'s other commercial sex acts "would have supported and corroborated her previous statements to law enforcement that [Calhoun] was not her pimp but a friend." That is a credibility or impeachment purpose intended to discredit D.T.'s trial testimony.

To the extent Calhoun had a legitimate purpose for introducing evidence of D.T.'s other commercial sexual acts, exclusion of the evidence was harmless. The evidence that D.T. was a victim of human trafficking and that Calhoun was the trafficker was overwhelming. Evidence that D.T. might have later worked as an "independent contractor" rather than for a pimp does not negate Calhoun's culpability as a sex trafficker who initially induced or forced her into a life of prostitution. From evidence of subsequent acts of prostitution, it is not reasonably likely the jury would have drawn the inference that D.T. was an "independent contractor" when she was with Calhoun because such an inference would have been contrary to nearly all the other evidence. We conclude it was not reasonably probable that a result more favorable to Calhoun would have been reached had he been permitted to introduce evidence of D.T.'s commercial sex acts for a purpose other than credibility or impeachment. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

D. *The Trial Court Did Not Err by Excluding the Evidence Under Evidence Code Section 352.*

Evidence of D.T.'s subsequent commercial sex acts was subject to exclusion under Evidence Code section 352. The trial court found that any probative value of the evidence was outweighed by prejudice. The trial court's section 352 ruling was not an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 40-41.) The relevance of evidence of D.T.'s subsequent commercial sexual acts was substantially

27

outweighed by probability it would focus attention on D.T.'s character and conduct and away from the issues of Calhoun's culpability. Admission of the evidence had the distinct probability of misleading the jury into believing D.T., and not Calhoun, was on trial. In addition, as the Attorney General argues, admission of evidence of D.T.'s subsequent commercial sex acts would have led to a mini-trial on all the circumstances surrounding D.T.'s conduct.

## II.

### The Evidence at the Preliminary Hearing Imparted Notice to Calhoun of the Factual Basis for Counts 6 and 7 Sufficient to Satisfy Due Process.

Calhoun was charged in count 6 with committing a lewd and lascivious act on a child under the age of 14 in violation of section 288, subdivision (a) and was charged in count 7 with oral copulation of a child under the age of 14 in violation of section 288a, subdivision (c)(1). Calhoun argues he was denied due process notice of the charges in counts 6 and 7 because he was convicted of them based on evidence not adduced at the preliminary hearing.

#### A. *Background*

The initial felony complaint alleged six counts. Count 1 charged Calhoun with human trafficking of a minor, count 2 charged him with pimping a minor, and count 3 charged him with pandering with a minor under the age of 16. Counts 4 and 6 charged Calhoun with violating of section 288a—committing a lewd and lascivious act on a child under the age of 14—and count 5 charged him with violating section 261.5, subdivision (b)—engaging in unlawful sexual intercourse with a minor.

At the preliminary hearing, D.T. testified she performed oral sex with Calhoun in Santa Ana on June 1, 2016. She could not recall where in Santa Ana or at what time that happened. At the preliminary hearing, D.T. testified she had sexual intercourse with Calhoun on June 1, 2016 at the home of his friend Joe. She also testified

28

she had sexual intercourse with Calhoun at his friend's house in San Bernardino and, on two occasions while they were in San Francisco, they had sexual intercourse at a cousin's house. D.T. testified that on June 1 and 2, she caught five dates with customers.

Based upon D.T.'s testimony, the prosecution requested the complaint be amended to add two more counts, count 7 and count 8, both alleging that between June 1 and June 2, 2016, Calhoun violated section 288a, subdivision (c)(1) by participating in an act of oral copulation with D.T. Count 7 was based on the theory D.T. orally copulated customers and Calhoun aided and abetted those offenses. Count 8 was based on D.T.'s testimony that she orally copulated Calhoun on June 1 or 2, 2016. At the preliminary hearing, the prosecutor confirmed that count 6 was also based on the theory Calhoun had aided and abetted customers in committing lewd and lascivious acts upon Danielle.

The trial court granted the request to add counts 7 and 8. The court then found sufficient and probable cause and held Calhoun to answer counts 1 through 8.

Subsequently, the trial court granted Calhoun's motion under section 995 to dismiss newly added count 7. An amended information removed the previously dismissed count 7 and renumbered count 8 as count 7. Count 6 remained count 6.

When the case was tried, count 7 alleged that on or about June 1 and 2, 2016, Calhoun violated section 288a, subdivision (c)(1) by engaging in oral sex with D.T., a child under 14 years of age and more than 10 years younger than he was. Count 6 alleged that on or about June 1 and 2, 2016, Calhoun violated section 288, subdivision (a) by committing a lewd and lascivious act on the body of D.T., a child under 14 years of age. Count 4 alleged the same offense as count 6 but for the time period from April 20 through June 2, 2016.

At trial, D.T. testified she had oral sex with Calhoun twice. D.T. could not recall where, when, or how the acts of oral sex took place except to say they took place somewhere in California. She was certain she orally copulated Calhoun twice. D.T. testified she had sexual intercourse with Calhoun at least four times, twice on two

29

different occasions at Louie's house. Later, during cross-examination, D.T. testified she did not know where or when she had sexual intercourse with Calhoun. D.T. also testified that on the night of June 1 and 2, 2016 she caught only two dates, rather than five.

At trial, the prosecution did not argue, and the court never instructed the jury, that count 6 was based on an aiding and abetting theory. Instead, the prosecutor argued in closing that count 6 related to one of the occasions when D.T. had sexual intercourse with Calhoun and count 7 related to an act of oral copulation between her and Calhoun. The trial court gave a unanimity instruction directed to counts 4, 6, and 7.

### B. *Relevant Law*

Article I, section 14 of the California Constitution requires that "[f]elonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information." This constitutional requirement means a person may not be prosecuted "in the absence of a prior determination of a magistrate or grand jury that such action is justified." (*Jones v. Superior Court* (1971) 4 Cal.3d 660, 666.) "Before any accused person can be called upon to defend himself on any charge prosecuted by information, he is entitled to a preliminary examination upon said charge, and the judgment of the magistrate before whom such examination is held as to whether the crime for which it is sought to prosecute him has been committed, and whether there is sufficient cause to believe him guilty thereof. These proceedings are essential to confer jurisdiction upon the court before whom he is placed on trial." (*People v. Bomar* (1925) 73 Cal.App. 372, 378.)

Once a defendant has been held to answer on the offenses alleged in a complaint, the People must within 15 days file an information alleging the offenses shown by the evidence presented at the preliminary hearing. (§ 739.) Due process requires that "an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317.) A defendant

30

therefore cannot be prosecuted for an offense not shown by the evidence at the preliminary hearing or not arising out of the transaction upon which the commitment was based. (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1531; *People v. Graff* (2009) 170 Cal.App.4th 345, 360 (*Graff*).) Phrased somewhat differently, the rule is, "[a]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense 'arose out of the transaction which was the basis for the commitment on a related offense.'" (*Jones v. Superior Court, supra*, 4 Cal.3d at pp. 664-665.)

### C. *There Was No Material Variance Between the Evidence at the Preliminary Hearing and the Evidence at Trial for Counts 6 and 7.*

Calhoun argues his conviction under count 7 was based on evidence not elicited at the preliminary hearing. At the preliminary hearing, D.T. testified that she engaged in oral sex once with Calhoun, in Santa Ana. At trial, D.T. testified she orally copulated Calhoun twice, but could not remember where or when she did so other than to say it was in California.

The variance between D.T.'s preliminary hearing testimony and trial testimony was not material and does not warrant dismissal of count 7. "[U]nder normal circumstances, [a defendant's] opportunity to prepare an effective defense would not be affected merely because the evidence at trial showed the offenses occurred at a different time (within the time frame alleged in the original information) or a different [place]. . . . [N]either the time [citation] nor the place at which an offense is committed [citation] is material, and an immaterial variance will be disregarded." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 906 (*Pitts*).)

The preliminary hearing placed Calhoun on notice he was being charged with one count of engaging in oral copulation with D.T. Her trial testimony was that she

31

orally copulated him twice. D.T. never recanted her preliminary hearing testimony; she merely testified at trial she could not remember where or when the acts occurred. D.T.'s trial testimony did not foreclose the possibility that at least one of the two acts was the one to which D.T. testified at the preliminary hearing. Either act of oral copulation to which D.T. testified at trial would have supported a conviction under count 7, and the trial court gave a unanimity instruction. Defendant does not demonstrate how he was misled when mounting his defense to count 7.

As to count 6, Calhoun argues: "The oral copulation events that [D.T.] testified to at trial and the evidence supporting Count Six were never the subject of a preliminary hearing . . . where it could be determined whether there was probable cause to believe that the offense had occurred." D.T.'s testimony at the preliminary hearing supported binding over Calhoun under count 6 on a theory he directly committed lewd and lascivious acts on D.T. At the preliminary hearing, D.T. testified Calhoun had sexual intercourse with her on at least four occasions between April 20 and June 1, 2016. Any one of those acts would have supported a conviction under section 288, subdivision (a) inasmuch as sexual intercourse when committed on a 13-year-old girl is a lewd and lascivious act.

The preliminary hearing thus placed Calhoun on notice that he must be prepared to defend against no less than four acts of committing a lewd and lascivious act on a child. Count 4 covered the period from April 20 through June 2, 2016, while count 6 covered the period June 1 and 2 of the same year. Although the prosecutor stated at the preliminary hearing that count 6 was based on an aiding and abetting theory, the evidence presented, and thus the transcript of the hearing, established he also could be held liable as a direct perpetrator. "[I]t is not the complaint but the totality of the evidence produced at the preliminary hearing which notifies the defendant of the potential charges he may have to face in the superior court." (*People v. Donnell* (1976) 65 Cal.App.3d 227, 233.)

32

Calhoun contends the evidence at the preliminary hearing was insufficient to bind him over on counts 6 and 7 because at trial D.T. retracted her preliminary hearing testimony. She did no such thing. At trial, D.T. testified she and Calhoun had oral sex twice and sexual intercourse at least four times; she simply could not remember by the time of trial where or when they did so. D.T. did not retract or recant her preliminary hearing testimony. Except for the number of customers she had on June 1 and 2, 2016, she did not testify she lied at the preliminary hearing. The only variance in evidence between the preliminary hearing and the trial was at trial D.T. could not recall where or when the acts of oral copulation or sexual intercourse took place.

Instructive is *People v. Gil* (1992) 3 Cal.App.4th 653, in which the defendant was convicted of five counts of forcible lewd conduct on two girls under the age of 14. At trial, one girl testified to incidents of the defendant touching her breasts and the defendant putting his penis in her vagina, and the other girl testified to acts of the defendant touching her breasts, putting his finger in her vagina, and putting his penis in her vagina. (*Id*. at pp. 655-657.) The defendant testified he had not committed any of the offenses. On appeal, the defendant argued he was denied notice of the charges because the evidence adduced at trial involved offenses not shown at the preliminary hearing. He claimed the inconsistencies about the dates of offenses and other changes in testimony at trial made the charges different than those shown at the preliminary hearing. (*Id*. at p. 657-658.)

In rejecting that argument, the Court of Appeal held the information charged the defendant with offenses shown by the evidence at the preliminary hearing in that the evidence at the preliminary hearing clearly supported five counts of lewd conduct however committed. (*People v. Gil, supra*, 3 Cal.App.4th at p. 658.) The court explained: "Inconsistencies and contradictions during the course of thorough cross-examination of child witnesses at trial is not persuasive of appellant's contention that the incidents at trial were completely different from the incidents described at the

33

preliminary hearing. The inconsistencies went to the weight and credibility of the testimony, not to the question of notice claimed by appellant." (*Id*. at p. 659.) The court found that even if there were inconsistencies, "it is unlikely appellant's ability to defend was prejudiced; his defense was not a specific alibi but a denial that molestations occurred at all." (*Ibid.*)

In this case, as in *People v. Gil,* the variations and inconsistencies between D.T.'s trial testimony and preliminary hearing testimony did not make the offenses charged in count 6 and count 7 different from those shown at the preliminary hearing. Instead, the inconsistencies and variances at most go to the weight and credibility of D.T.'s trial testimony. We cannot see how Calhoun could have suffered any prejudice because his defense was, like that of the defendant in *People v. Gil*, he never committed the offenses.

The cases relied upon by Calhoun do not support dismissal of count 6 or 7. *Pitts, supra*, 223 Cal.App.3d at page 634, involved a 53-count information against one group of defendants, and a 58-count information against another group of defendants. The two informations alleged numerous charges of sex abuse against many child victims. (*Ibid.*) The Court of Appeal dismissed some of the counts because variances between the evidence at the preliminary hearing and the evidence at trial denied the defendants an opportunity to prepare a meaningful defense. (*Id.* at p. 905.) The court noted that variances in the time and place at which specific acts occurred were not material. (*Id*. at p. 907.) But many counts charged the defendants with conduct for which no evidence was adduced at the preliminary hearing; in others, the evidence at the preliminary hearing supported a different count; and in others, evidence was adduced at one defendant's preliminary hearing that was not adduced at the preliminary hearings for other defendants. (*Id.* at pp. 908-914.) The Court of Appeal noted that for some counts as charged in an amended information "the specific act and/or actors changed from previous amendments, and/or the specific act involving specific actors was not shown by evidence

34

adduced at a particular preliminary hearing." (*Id.* at p. 907.) Such variances were material and, consequently, the preliminary hearing transcript did not impart notice sufficient to satisfy due process. (*Id.* at pp. 907-908.)

In this case, in stark contrast to *Pitts,* the evidence at the preliminary hearing placed Calhoun on notice that, in addition to human trafficking, pimping, and pandering, he would have to defend charges he orally copulated D.T. once on June 1 or 2, 2016, engaged in sexual intercourse with her at least four times between April 20 and June 2, 2016, and aided and abetted her in engaging in sex acts with others on June 1 and 2, 2016. The information and amended information charged Calhoun with committing the acts against D.T. adduced by the evidence at the preliminary hearing. There were no changes in the specifics or actors from previous charging documents or from the evidence adduced at the preliminary hearing. Unlike *Pitts*, here, there could be no confusion about the actors, since Calhoun and D.T. were the only actors, about the time frame, which did not change from April 20 to June 2, 2016, or about the charged sexual acts directly perpetrated against D.T. To the extent there was a variance, Calhoun has not demonstrated how he might have been misled or suffered prejudice.

In *People v. Burnett* (1999) 71 Cal.App.4th 151, 155-156 (*Burnett*), the defendant was charged with being a felon in possession of a weapon, which was specifically alleged to be a .38-caliber revolver. During trial, a new witness described a second, entirely different incident involving a .357-caliber revolver. (*Id.* at p. 157.) The trial court permitted the prosecutor to amend the information to strike the .357-caliber allegation from the information. (*Id.* at p. 164.) The prosecutor argued the jury could convict the defendant based on either incident. (*Id.* at p. 169.) The jury convicted the defendant of being a felon in possession. (*Id.* at p. 156.)

On appeal, the defendant argued his conviction must be reversed because he was tried for the incident involving possession of the .357-caliber revolver, an offense not shown by the evidence at the preliminary hearing. (*Burnett, supra*, 71 Cal.App.4th at

p. 164.) The Court of Appeal concluded the defendant could not have been prosecuted or convicted for possession of the .357-caliber revolver because that incident was separate, distinct, and not transactionally related to the incident shown by the evidence at the preliminary hearing. (*Id.* at p. 178.) The court reversed the conviction because the defendant's trial attorney rendered ineffective assistance of counsel by failing to object when it became clear the jury was going to be asked to convict based either on the incident that was the subject of the preliminary hearing or on the second incident described at trial. (*Id.* at pp. 179-183.)

This case does not present the situation in which a new witness, who did not testify at the preliminary hearing, testifies at trial about an incident separate, distinct and transactionally unrelated to the offense shown by the evidence at the preliminary hearing. Instead, in this case, the victim, D.T., testified at trial to a greater number of offenses than the number charged. The unanimity instruction ensured the juror's agreement as to the facts constituting the offense. (*Burnett, supra,* 71 Cal.App.4th at p. 173.)

In *Graff, supra*, 170 Cal.App.4th at page 349, the Court of Appeal reversed the defendant's convictions on two counts of violating section 288, subdivision (c)(1) (section 288(c)(1)) because the jury was permitted to convict based on charges not established at the preliminary hearing. The defendant was initially charged with six counts of violating section 288(c)(1). At the preliminary hearing, the victim testified to five incidents of lewd conduct committed by the defendant, two of which involved the defendant watching her masturbate. Because the victim was not certain whether the masturbation incidents occurred before or after she turned 16 years old, the magistrate dismissed the two counts that were based on those incidents. (*Id.* at p. 351 and fn. 7.) After the preliminary hearing, an information was filed charging the defendant with three counts of violating section 288(c)(1). (*Id.* at pp. 350-351.)

36

At trial, the victim testified to the same five incidents of lewd conduct and was also allowed to testify concerning the masturbation incidents "as indicative of motive or intent" under Evidence Code section 1101, subdivision (b). (*Graff, supra*, 170 Cal.App.4th at p. 353.) The victim testified she was 15 years old when the first masturbation incident occurred, but was unsure of her age when the second incident occurred. (*Id*. at p. 354.) In closing argument, defense counsel stated there were "[n]o charge[s] concerning the masturbation episodes." (*Id*. at p. 357.) In rebuttal, the prosecutor disagreed and argued the defendant could be convicted of "*any lewd act that he committed with* [*the victim*] *while she was 14 or 15 years old,*" including the masturbation incidents. (*Id*. at p. 358.) The jury convicted the defendant of two counts of violating of section 288(c)(1). (*Id*. at p. 360.)

The Court of Appeal, reversing, held "[the defendant's] due process rights to notice of the charges against him were violated by the prosecution's decision to go forward with charges not established at the preliminary hearing." (*Graff, supra*, 170 Cal.App.4th at p. 360.) The court concluded the magistrate was correct in ruling the prosecution failed to present evidence at the preliminary hearing to show the masturbation incidents fell within the timeframe necessary to establish a section 288(c)(1) violation. (*Id*. at p. 361.) The prosecution never sought, and the trial court never granted, an amendment of the information to charge the defendant with violations of section 288(c) based on the incidents of masturbation. (*Id*. at p. 362.) Thus, the defendant was wrongly convicted of offenses not established at the preliminary hearing or charged in the information. The Court of Appeal concluded the defendant suffered prejudice from the prosecution's delay in making its theory known because "[i]n cross-examining [the victim], defense counsel had no reason to pin down the dates of the masturbation incidents or to impeach [the victim] with her earlier testimony that she could not remember when either of the incidents occurred." (*Ibid*.)

*Graff* does not help Calhoun. In *Graff*, the defendant was convicted of violating section 288(c)(1) based on the masturbation incidents even though the magistrate had dismissed the counts based on those incidents and the prosecutor had never amended the information. Here, Calhoun was not convicted of any offense based on incidents that had formed the basis of counts dismissed by the magistrate after the preliminary hearing. In addition, unlike the defendant in *Graff*, Calhoun has not demonstrated how any variance between the preliminary hearing testimony and the information or the trial testimony had any effect on the way in which D.T. was cross-examined.

### III.

### Venue in Orange County Was Proper.

After the prosecution rested, Calhoun brought an oral motion for judgment of acquittal under section 1118.1 on the ground that Orange County was an improper venue for counts 4 through 7.[3] He contends the trial court erred by denying the motion.

#### A. *Background*

At the preliminary hearing, D.T. testified that on June 1, 2016 she had oral sex with Calhoun in Santa Ana and had five customers. That testimony was the basis for establishing venue in Orange County for counts 4 through 7. At trial, D.T. testified she did not know where Calhoun engaged in oral sex and sexual intercourse with her except to say it was somewhere in California.

In opposition to Calhoun's motion for a judgment of acquittal for improper venue, the prosecutor argued that human trafficking (count 1) was a continuous offense,

---

[3] We refer to the counts as they were numbered and presented at trial, that is, counts 4 and 6 were for lewd and lascivious acts on a child under the age of 14 (§ 288, subd. (a)), count 5 was for unlawful sexual intercourse (§ 261.5, subd. (d)), and count 7 was for oral copulation with a child under the age of 14 (§ 288a, subd. (c)(1)).

38

and that the acts alleged in counts 4 through 7 were part of human trafficking. Thus, the prosecutor argued, all of the counts were connected in their commission. In a written brief, the prosecutor argued Calhoun's motion was untimely and should have been made before the start of trial. If timely, the motion should be denied because venue in Orange County was proper under section 781 in that the offenses were committed at least in part in Orange County and because venue was a fact to be established at the preliminary hearing. At the preliminary hearing, D.T. testified at least one act of sexual intercourse and one act of oral copulation occurred in Orange County.

Defense counsel argued in response that the matter was governed by section 784.7, subdivision (a), which governs sex offenses where some are committed in one county, and some in another, and which allows cross-county filings only upon written permission of the transferring county and a hearing assuring that the offenses are properly joined.

The trial court concluded section 781 was the controlling statute. The court found that D.T. had testified at the preliminary hearing the sexual acts had been committed in Orange County and her later trial testimony that she did not know where the acts occurred was not in conflict. D.T.'s uncontradicted preliminary hearing testimony established venue in Orange County under section 781. The court denied Calhoun's motion.

### B. *Relevant Venue Statutes*

Section 777, which sets forth the basic rule of venue for criminal cases, states: "[E]xcept as otherwise provided by law the jurisdiction of every public offense is in the competent court within the jurisdictional territory of which it is committed." Under section 777, "venue lies in the superior court of the county in which the crime was committed, and a defendant may be tried there." (*People v. Posey* (2004) 32 Cal.4th 193, 199 (*Posey*).) Venue is a question of law to be decided by the court prior to trial. (*Id.* at p. 201.)

39

When the criminal conduct is committed in more than one county, section 781 sets forth the basic rule. Section 781 states in relevant part: "[W]hen a public offense is committed in part in one jurisdictional territory and in part in another jurisdictional territory, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction for the offense is in any competent court within either jurisdictional territory." Under section 781, "'where only a part of a crime has been committed in one county and the other part or parts have been committed in another, venue lies where only a part of the crime was done.'" (*People v. Thomas* (2012) 53 Cal.4th 1276, 1283.)

Section 784.7 governs venue for multiple violations of certain sex offenses. Subdivision (a) of section 784.7 states: "If more than one violation of Section 220, except assault with intent to commit mayhem, 261 [rape], 262 [spousal rape], 264.1 [rape or genital penetration in concert], 269 [aggravated Sexual assault of a child], 286 [sodomy], 287, 288 [lewd or lascivious conduct with child under 14], 288.5 [continual sexual abuse of child], 288.7 [sexual acts with a child 10 years or younger], or 289 [forcible sexual penetration] or former Section 288a [oral copulation] occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial. At the section 954 hearing, the prosecution shall present written evidence that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is not a written agreement from the district attorney shall be returned to that jurisdiction." Section 784.7 governs venue only if no other statute authorizes trial in a particular jurisdiction. (*People v. Aleem* (2006) 144 Cal.App.4th 1155, 1160.)

Venue in Orange County for counts 1, 2, and 3 was proper under sections 781 and section 784.7, subdivision (c). Section 784.7, subdivision (c) provides, in

40

relevant part: "If more than one violation of Section 236.1 [human trafficking of a minor], 266h [pimping of a minor under the of 16], or 266i [pandering of a minor under the age of 16 by procuring] occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing pursuant to section 954, within the jurisdiction of the proposed trial."

C. *D.T.'s Preliminary Hearing Testimony Established Venue in Orange County for Counts 4 Through 7.*

At the preliminary hearing, D.T. testified she had sexual intercourse and oral sex with Calhoun in Santa Ana on June 1, 2016. She also testified she caught two dates that night before getting a bite to eat and caught two or three dates after eating. At the preliminary hearing, the prosecutor stated count 6 was based on the theory that Calhoun committed lewd and lascivious acts on D.T. by aiding and abetting those acts of prostitution in Santa Ana. D.T.'s testimony conferred venue in Orange County over counts 5, 6, and 7 under section 777 and allowed joinder of count 4. Count 5 (§ 261.5, subd. (d)) was not subject to section 784.7, subdivision (a). An alternate basis for venue of count 5 was that it was alleged to have been committed as part of the human trafficking offense with acts or effects in several counties and therefore venue in Orange County was proper under sections 781 and 784.7, subdivision (c).

Calhoun agrees Orange County venue was properly established at the preliminary hearing for counts 4 through 7. He concedes he had no cause to challenge venue based on the preliminary hearing testimony and he did not challenge venue until after the prosecution rested at trial.[4] He contends, however, that D.T.'s trial testimony

[4] The Attorney General argues venue must be challenged before trial or is forfeited. In *People v. Simon* (2001) 25 Cal.4th 1082, 1086-1087, the California Supreme Court concluded, "the interests of both the accused and the state support a requirement that any objection to the proposed location of a . . . trial must be specifically raised prior to commencement of trial, *before* the defendant is required to undergo the rigors and

41

eliminated the factual basis for Orange County venue over counts 4 through 7 because at trial D.T. testified she did not know where she orally copulated Calhoun except to say it was in California.

D.T.'s trial testimony did not divest Orange County of venue for counts 4 through 7. We assume for argument's sake that trial testimony could divest a court of venue once venue has been confirmed by evidence at the preliminary hearing. We find it significant, as did the trial court, that D.T. did not testify she lied at the preliminary hearing about engaging in oral sex with Calhoun in Santa Ana. She testified at trial she did not know where that happened. Thus, venue was not premised on false testimony. The trial court, in which venue decisions are vested (*Posey, supra*, 32 Cal.4th at p. 201), reached the same conclusion. As there was no contradiction between D.T.'s preliminary hearing and trial testimony, and D.T. did not retract her preliminary hearing testimony, D.T.'s preliminary hearing testimony remained sufficient to support venue under section 777. If, as Calhoun contends, D.T.'s trial testimony were controlling on the issue of venue, then no county would have venue over counts 4 through 7.

Upholding Orange County venue on counts 4 through 7 comports with the purposes for the criminal venue statutes identified in *People v. Simon, supra,* 25 Cal.4th at page 1095. Calhoun does not contend that Orange County venue caused him inconvenience or impaired his ability to obtain evidence or secure witnesses. To the contrary, he was subject to trial on counts 1 through 3 in Orange County regardless of venue on the other counts. Defense evidence and witnesses were the same for all counts. Calhoun was arrested in Orange County while engaging in acts of human trafficking, pimping, and pandering, for which he was prosecuted. Orange County thus bore a

hardship of standing trial in an assertedly improper locale, and *before* the state incurs the time and expense of conducting a trial in that county." *Simon* did not address the situation presented here, in which the grounds for challenging venue first appeared during trial. We address Calhoun's venue challenge on the merits.

42

reasonable relationship to the criminal offenses, and it cannot be said the prosecution chose Orange County because it would be more hostile to or burdensome for Calhoun. The people of Orange County have a right to judge Calhoun on crimes committed here.

Because we conclude D.T.'s preliminary hearing testimony established venue in Orange County over counts 4 through 7 under sections 777, 781, and 784.7, we need not address the Attorney General's arguments that Calhoun forfeited a challenge to venue, a motion under section 1118.1 was the wrong vehicle for challenging venue, or that venue for the human trafficking count also established venue over counts 4, 6, and 7.

**IV.**

**The Trial Court Did Not Err by Admitting Evidence of
Text Messages from the Vortex Cell Phone and Messages
Related to Number (xxx) xxx-5542.**

Calhoun argues the trial court erred by admitting text messages from the Vortex cell phone and text messages to and from the cell phone associated with the number (xxx) xxx-5542. He argues the prosecution failed to authenticate the text messages as coming from numbers associated with him.

A. *Background*

Exhibit 19, the Cellebrite report for the Vortex cell phone, identified incoming and outgoing text messages from July 5, 2016 through November 5, 2016. Calhoun's trial counsel did not object to admission of exhibit 19. To avert an ineffective assistance of counsel claim, we shall address Calhoun's argument that the trial court erred in admitting it.

The cell phone associated with the number (xxx) xxx-5542 was never recovered and so there is no Cellebrite report for it. The Vortex cell phone and the ZTE cell phone (D.T.'s personal cell at the time D.T. was detained by Hernandez) communicated with the (xxx) xxx-5542 cell phone. Exhibit 35 is a collection of text messages to and from number (xxx) xxx-5542. Calhoun's counsel objected to the

43

admission of any evidence of text messages from the (xxx) xxx-5542 cell phone to the Vortex cell phone or the ZTE cell phone on the ground the prosecutor failed to lay a foundation to show the messages from the (xxx) xxx-5542 cell phone were made by Calhoun.

## B. *Relevant Law*

A writing must be authenticated before it may be admitted into evidence. (Evid. Code, § 1401; *People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)  Authentication is defined as "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is" or "the establishment of such facts by any other means provided by law."  (Evid. Code, § 1400.)  The proponent of documentary evidence has the burden of establishing authenticity and meets that burden by producing evidence sufficient to sustain a finding the document is what it purports to be.  (*People v. Perez* (2017) 18 Cal.App.5th 598, 621.)  Authenticity may be established by the contents of the writing, or other means, including circumstantial evidence, and the author's testimony is not required.  (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434-1435.)

## C. *The Text Messages Were Properly Authenticated.*

### 1. *Vortex Cell Phone*

The prosecution produced sufficient evidence to support a finding that the text messages related in exhibit 19 (the Cellebrite report for the Vortex cell phone) were between D.T. and Calhoun.  Hernandez's testimony established the Vortex cell phone belonged to Calhoun.  Hernandez testified that when she stopped Stewart in May 2016 she searched his car and found two cell phones in the center console.  D.T. told Hernandez the phones belonged to Calhoun and the Vortex cell phone was used for text messages.  D.T. said she took the cell phones with her when she left Louie's house while Calhoun was away.

44

The evidence also showed that, although the Vortex cell phone belonged to Calhoun, D.T. used that phone to communicate with him. D.T. told Hernandez that she used the Vortex cell phone to communicate with Calhoun. In addition, the contacts and messages reflected in the Cellebrite report establish that D.T. used the Vortex cell phone to communicate with Calhoun. The Vortex cell phone had a contact for "Daddy" with Calhoun's photograph. Exhibit 19 shows the contact for Daddy is associated with the number (xxx) xxx-5542.

Exhibit 19 shows two outgoing text messages (#83, #188) sent to (xxx) xxx-5542 that refer to "John," and other text messages refer to pimping and prostitution. Incoming text messages from (xxx) xxx-5542 clearly are from the pimp (#28: "Hey wen u out there don't text"; #55: "Do u have a condom"; #76: "I got to get you some condoms, I forgot"). Outgoing text messages to (xxx) xxx-5542 are clearly from the prostitute (#39: "I got one that has 40"; #48: "I have the money"; #102 "Daddy hows much long I got to be out here").

Calhoun argues the Vortex cell phone probably belonged to D.T. Whether the phone belonged to D.T. or to Calhoun, the significant point is that the prosecution met its burden of establishing that D.T. *used* the cell phone to communicate by text message with Calhoun at the (xxx) xxx-5542 number.

2. *Phone No. (xxx) xxx-5542*

The prosecution presented sufficient evidence to establish that the unrecovered phone associated with the number (xxx) xxx-5542 belonged to Calhoun. There are at least two outgoing messages on the Vortex cell phone to the number (xxx) xxx-5542 that refer to "John." Exhibit 35 is an extraction report for messages to or from (xxx) xxx-5542. The messages listed on exhibit 35 are either to or from "Daddy" and most refer to pimping and prostitution. Several messages (#11, #45, and #55) sent to (xxx) xxx-5542 refer to "John." One message (#20) sent to that number was "Auntie said for u to call her." Auntie was the nickname Calhoun used for Louie.

Exhibit 34 is the Cellebrite report for D.T.'s personal ZTE cell phone. Entry number 146 on exhibit 34 is an incoming message dated May 11, 2016 from Daddy at number (xxx) xxx-5542. The message reads in part, "give me my phones I need my white [one] I'm not playing." D.T. told Hernandez the two phones found in the center console of Stewart's car were taken from Calhoun. One phone was white. Hernandez detained D.T. on the night of May 11 or the early morning of May 12, 2016.

**V.**

**Expert Testimony on D.T.'s Statements Made During a
Police Interview and on the Content of Text Messages
Was Admissible or Harmless Error.**

Calhoun argues the trial court erred by permitting Hernandez to testify about statements made by D.T. during her police interview on May 11, 2016 and by permitting Hernandez and Medina to testify about the content of text messages between D.T. and Calhoun. He argues the challenged testimony constituted case-specific hearsay made inadmissible by *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and violated his Sixth Amendment right to confront and cross-examine witnesses.

The Attorney General argues Calhoun forfeited his confrontation clause claim by not posing objections specifically on that ground. Calhoun made a general objection to evidence about text messages and made a hearsay objection to any testimony about statements made by D.T. to Hernandez. "'[C]ounsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal.'" (*People v. Redd* (2010) 48 Cal.4th 691, 729.) Calhoun never specifically objected based on *Sanchez* or the confrontation clause. But to avert an ineffective assistance of counsel claim, we deem counsel's objections sufficient to preserve those claims.

A. Crawford v. Washington *and* Sanchez

The confrontation clause of the Sixth Amendment to the United States Constitution grants a criminal defendant the right to confront adverse witnesses. (U.S. Const., 6th Amend.) Admission of testimonial hearsay is therefore barred by the confrontation clause unless the speaker is unavailable to testify and the accused previously had the opportunity to cross-examine the speaker, or the accused has forfeited the right to do so by his or her own wrongdoing. (*Crawford v. Washington* (2004) 541 U.S. 36, 68.)

In *Sanchez*, the California Supreme Court concluded the holding in *Crawford* applies to testimonial hearsay information concerning a defendant's gang affiliation and activity. (*Sanchez, supra*, 63 Cal.4th at pp. 679-685.) In *Sanchez*, the court held (1) an expert witness may not relate as true case-specific facts asserted in hearsay statements unless they are independently proven and (2) if a prosecution expert witness seeks to relate testimonial hearsay, there is a violation of the federal confrontation unless there is a showing of unavailability, the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing. (*Id.* at p. 686.)

The California Supreme Court confirmed that an expert may rely on hearsay in forming an opinion but concluded an expert may not relate case-specific facts asserted in hearsay statements "unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 686.) An expert may "testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean." (*Id.* at p. 676.) The court in *Sanchez* explained that case-specific facts are those of which the expert has no independent knowledge and relate "to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) The expert may render an opinion based on case-specific facts but may not relate such facts unless they are within the expert's personal knowledge. (*Ibid.*)

47

The *Sanchez* court considered the permissible scope of expert testimony and adopted this rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. omitted.)

We assess prejudice resulting from the admission of expert testimony in violation of *Sanchez* under the standard of *Watson, supra*, 46 Cal.2d at page 836. (*People v. Flint* (2018) 22 Cal.App.5th 983, 1003-1004 (*Flint*); *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 510.) The *Watson* standard applies "even where the expert's testimony included multiple statements that were inadmissible under *Sanchez*." (*Flint, supra,* at p. 1004.) Under the *Watson* standard, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.)

B. *Testimony on D.T.'s Statements Made During the Police*
*Interview Was Admissible Under the Hearsay Exception for*
*Prior Consistent Statements.*

When D.T. was detained in May 2016, she was taken to a sheriff's station where she was interviewed by Hernandez and a sheriff's deputy. At trial, Hernandez testified about statements made by D.T. during the interview. The Attorney General does not dispute the testimony was offered for the truth of the statements made by D.T. but argues D.T.'s statements fell within the hearsay exception for prior consistent statements.

Evidence Code section 1236 states: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is

consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791, subdivision (b) allows a prior consistent statement if "[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Calhoun concedes that express and implied charges of fabrication were made throughout D.T.'s trial testimony. "This broad, implicit charge of fabrication" allowed the introduction of D.T.'s prior consistent statements. (*People v. Kopatz* (2015) 61 Cal.4th 62, 86.) Calhoun contends D.T.'s statements made during the interview were inconsistent with her trial testimony and D.T. admitted at trial that some statements made during the interview were false.

We agree with the Attorney General that D.T.'s statements made during the interview, and related by Hernandez in her testimony, were for the most part consistent with D.T.'s trial testimony. Most significantly, D.T. told Hernandez and testified at trial that Calhoun was her pimp, he drove her to several blades to work as a prostitute, she had been working for Calhoun for several months, and he physically abused her.

Calhoun does not entirely disagree; instead, he identifies four categories of statements made by D.T. during the interview which he contends either were inconsistent with her trial testimony or admitted to be false.

(1) Calhoun asserts: "[D.T.] never testified on direct that Mr. Calhoun believed she was 14 years old. [D.T.] never testified that Mr. Calhoun punched her in the jaw. [D.T.] never testified that Mr. Calhoun required a trap of $500 to $600 a night and if she did not make her trap, Mr. Calhoun would hit her. [D.T.] also never testified that Mr. Calhoun's cousin Raymond threatened to shoot her up." This assertion is correct. But, as the Attorney General points out, there was abundant evidence that on one occasion Calhoun punched D.T. on the left side of her face, giving her a black eye, and that on

49

another occasion he hit her in the face several times with the back of his hand. Admission of the other statements was harmless: The evidence established that Calhoun used violence against D.T., and whether or not Calhoun punched her in the jaw, he did punch her. Raymond's threat to shoot D.T. did not implicate Calhoun. Whether or not Calhoun believed or knew D.T. was 14 years old is immaterial because mistake of fact about a minor victim's age is not a defense to human trafficking, pimping a child, or procuring a child. (§ 236.1, subd. (e); *People v. Branch* (2010) 184 Cal.App.4th 516, 521-522.)

(2) Calhoun asserts D.T., at trial, admitted the following statements made during the police interview were false: Stewart was her boyfriend, she first had sex with him, he turned her into a prostitute, and she stayed with him when she had nowhere to go. Stewart was her pimp and told her "the rules" for being a prostitute. Those statements were inconsistent with D.T.'s trial testimony and should have been excluded. The error was harmless given the overwhelming evidence that Calhoun committed the charged offenses. Indeed, the error redounded to his benefit, because the inconsistency undermined D.T.'s credibility.

(3) Calhoun asserts D.T. was not telling the truth when she told Hernandez that Calhoun had taken her "multiple times" to the blade in Orange County. At trial, D.T. testified the first time and only time she went to Orange County was on the night she was arrested (June 1-2, 2016). Hernandez testified D.T. had said Calhoun drove her to several blades, including Harbor Boulevard in Orange County, to work as a prostitute. D.T.'s statement to Hernandez was inconsistent with D.T.'s trial testimony. Error in admitting evidence of the statement was harmless given the overwhelming evidence that Calhoun committed the charged offenses. Indeed, the error redounded to his benefit, because the inconsistency undermined D.T.'s credibility.

50

(4) Calhoun asserts D.T. was not telling the truth when she said at the interview she and Calhoun had had sex several times. He does not provide a citation to the record for D.T.'s statement to Hernandez. We decline to consider the assertion.

### C. *Any* Sanchez *Error Was Harmless.*

Calhoun contends the trial court committed *Sanchez* error and violated his confrontation clause rights by permitting Hernandez and Medina to testify about the content of text messages between D.T. and Calhoun. Any conceivable *Sanchez* error was harmless because the content of the text messages was independently proven through the Cellebrite reports and extracts from those reports, which were properly authenticated and admitted into evidence as exhibits 19, 21-26, and 33-35. (*Flint, supra*, 22 Cal.App.5th at p. 1000.)

In addition, as the Attorney General argues, the content of the text messages between Calhoun and D.T. was admissible under the coconspirator exception to the hearsay rule, Evidence Code section 1223. Hearsay statements made by coconspirators are admissible against a party if the offering party presents independent evidence to establish the prima facie existence of a conspiracy. (*People v. Hardy* (1992) 2 Cal.4th 86, 139.) "Once independent proof of a conspiracy has been shown, three preliminary facts must be established: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.'" (*Ibid.*)

Sufficient evidence was presented at trial to establish the prima facie existence of a conspiracy between Calhoun and D.T. A prostitute can conspire with a pimp; their functions are "interrelated" and one aids and abets the other. (*People v. Ambrose* (1986) 183 Cal.App.3d 136, 139.) Sufficient evidence at trial was presented to establish the three preliminary facts necessary to make the coconspirator statements

51

admissible. The challenged text messages were by D.T. or Calhoun while he was pimping her (while participating in the conspiracy), the messages all dealt with pimping and prostitution (the object of the conspiracy), and Calhoun (the party against whom the evidence was offered) was participating in pimping when the text messages were sent or received.

### D. *There Was No Confrontation Clause Violation.*

There was no confrontation clause violation because the text messages were not testimonial. In determining whether a hearsay statement is testimonial, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony." (*Ohio v. Clark* (2015) __ U.S. __ [135 S.Ct. 2173, 2180].) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez, supra*, 63 Cal.4th at p. 689.)

We question whether the text messages are hearsay and thus even subject to exclusion under the confrontation clause. We do not need to decide that issue because the text messages are not in the least bit testimonial. The messages were informal, did not involve law enforcement, and did not have the primary purpose of creating a substitute for trial testimony or memorializing facts relating to past criminal history.

## VI.

### The Trial Court Stayed Execution of Sentence on Counts 2, 3, and 5 Pursuant to Section 654.

Calhoun argues the trial court erred by imposing concurrent sentences on counts 2, 3, and 5 instead of staying execution of sentence on those counts under section 654. The trial court stayed execution of sentence on those counts. At the sentencing, the court stated, "stayed 654 of the Penal Code," as to counts 2, 3, and 5. The court minutes

52

have the entry "stayed pursuant to Penal Code section 654" for the sentence on each of those counts. The abstract of judgment indicates the sentences on counts 2, 3, and 5 as being stayed under section 654.

## DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G055511 |
| v. | (Super. Ct. No. 16CF2487) |
| JOHN WAYNE CALHOUN, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Appellant. | |

The Office of the District Attorney, Orange County, California, has filed a request that our opinion, filed on July 9, 2019, be certified for publication. It appears our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(1), (4), and (6). The request is GRANTED. The opinion is ordered published in the Official Reports. Respondent's request for partial publications is DENIED as moot.

FYBEL, J.

WE CONCUR:

MOORE, ACTING P. J.

ARONSON, J.

54